## ROSWELL WESTBROOK v. STATE.

No. A-2756.   Opinion Filed April 30, 1918.

(172 Pac. 464.)

1.   **DEPOSITIONS—Nonresident Witnesses—Criminal Case.**   The right to take and use depositions of nonresident witnesses in behalf of the defendant in a criminal case is statutory. Penal Code, art. 17. The statute regulates the practice in such cases, and its provisions must be substantially complied with.

2.   **APPEAL AND ERROR—Depositions—Application for Commission—Continuance—Modification on Appeal.**   The information charged two defendants with the crime of murder. On the day they entered their pleas of not guilty, defendants served the statutory notice on the prosecuting attorney, and on the day named in the notice filed application for a commission to take the deposition of a nonresident witness, which application was overruled. They also filed motion for continuance by reason of the absence of material witnesses, which motion was denied, and the case was called for trial the seventh day after their arraignment. A severance was demanded and granted. **Held,** that the court erred in overruling the application for a commission to take the deposition, and erred in denying the motion for continuance.

**Held,** further, that the plaintiff in error upon his separate trial having failed to renew the application and motion, and his guilt having been established by facts admitted or so clearly established as to be beyond controversy, this court will not consider the erroneous rulings such as demand a reversal of the conviction, but, in the exercise of its power to modify any judgment appealed from by reducing the sentence, the judgment and sentence of death is modified to that of imprisonment in the state penitentiary at hard labor for life, and as thus modified the judgment is affirmed.

*Appeal from District Court, Latimer County;*
*W. H. Brown, Judge.*

Roswell Westbrook was convicted of murder and adjudged to suffer death, and he appeals. Modified and affirmed.

The plaintiff in error, Roswell Westbrook, and Jack McKennon were jointly informed against for the murder

of Calvin Tomlinson, alleged to have been committed in Latimer county on the 7th day of February, 1916, by shooting him with a pistol. When the cause was called for trial, a severance was demanded. The state elected to try Westbrook first. The jury returned a verdict finding the defendant, Roswell Westbrook, guilty of murder, and fixing his punishment at death. From the judgment and sentence pronounced and entered in pursuance of the verdict, the defendant appeals.

The evidence shows that Calvin Tomlinson, the deceased, 21 years of age, resided with his aged parents on a rented farm in the northeastern part of Latimer county; the place being about 14 miles southwest of the town of Sutter, sometimes called Calhoun, in Le Flore county. The family lived in a single-room house with a shed kitchen. On the night of the tragedy they went to bed about 7 o'clock; the old folks occupying a bed on one side of the fireplace, and the young man a bed on the other side. Shortly after they retired the front door was forced open by two men, who fired three or four shots at the young man, two of which struck him, from the effects of which he died the next evening. They then forced his father to give them his money, amounting to $60.

Mary Tomlinson testified: That she was 69 years old. That when she went to bed that evening she threw a pine knot in the fireplace and it gave a good light. That two men forced the door and broke the latch. As they came in her son raised up, and they shot him. One of the men had a scarf around his face, and the other one had a cape over his face. That she lit the lamp and grabbed her son's shoe and hit the robber that shot him over the head with it and knocked his mask off. He then hit her with

his six-shooter and knocked her down, and her son said: "Come on, Mama! He will kill you, for he has shot me." And she went out the back door with him. That the other robber held a six-shooter in the old man's face, and said, "Give up your money." That she with her son went to the smokehouse, and he said: "Mama, they have killed me. That was Jack McKennon. I saw him in Sutter Christmas." That she knew McKennon and recognized him. When the robbers left, she took her son back into the house and put him in bed, and then knocked on the plow with a hammer and halloed.

W. S. Tomlinson testified: That they went to bed about 7 o'clock, and shortly after the door of his house was forced open and two men came in. Their faces were covered, and they fired three or four shots. One of them held a pistol in his face and said, "Give up your money!" and he gave them $60. That his son and his wife had left the room, and he ran out while the robbers were counting the money.

The undisputed facts are that the defendant, Westbrook, lived at Sutter, and on the 7th day of February he borrowed a horse from Finis Herron, commonly called "Skin Herron," and a saddle from W. J. Sterling, saying that he wanted to ride out to a sawmill. He was then carrying a big pistol stuck in the waistband of his pants. About the same time Jack McKennon went to Johnson & Embrey's livery barn in Sutter and hired a sorrel blaze face pony to ride out into the country, saying that he preferred to ride his own saddle. He went to John Green's, about 300 yards from the livery barn, for his saddle. They met in the street in the west part of Sutter, near the home

of Ben Priest, and from there rode out of town in a westerly direction. Westbrook had a package tied to the horn of his saddle.

Jesse Johnson testified: That about noon, February 7th, Jack McKennon came into his livery barn and hired a sorrel bald-face pony to ride out into the country. He said he would use his own saddle. That McKennon's saddle was in the barn the next morning. That the pony had crooked ankles, and his shoe tracks were deeper in the ground on the outside than on the inside.

Frank Harris testified: That he lived about seven miles from Sutter, and about six miles from old man Tomlinson. That he was making rails the afternoon of the 7th of February, and saw two men on horses passing along the road at the foot of the mountain. That one was riding a sorrel blaze-face pony, and the other was riding a large dark brown horse, and they were going in the direction of old man Tomlinson's. That it was then about 3 o'clock. That the next day he examined the tracks of the horses, which showed that not far from where he saw them they left the road and turned off through a buckbush and brier thicket, and he found the same tracks in the road on the other side of his place, going the other way toward Sutter.

Seven or eight farmer neighbors of Tomlinson testified: That they were at the Tomlinson place shortly after the shooting, and the next morning they made an examination of the surrounding country, and found where the fence had been cut in a pasture near Tomlinson's home, and they found tracks of a large horse and a pony. That they followed these tracks to within a mile or two of Sutter. When they reached Sutter that day, they took the

blaze-face pony that was ridden by McKennon and Herron's horse that was ridden by Westbrook out to the trail, and there compared the tracks they had followed and those made by the horse and pony, and found them to be identical.

Charity Covey and her mother, Mrs. Bertha Priest, testified that on Sunday evening, February 6th, at their home in Sutter, Roswell Westbrook said that he was going to rob an old man of his money.

Mrs. Bertha Priest testified: That about 1 o'clock on February 7th Westbrook came to her house and asked, "Where is Charity?" and she told him over at McClain's. "That he looked like he had been drinking," and she said, "What is the matter with you?" and he said: "Oh, hush, kid. We have got to make some money. We are going to have $900, and if we can't get $900 we will take $300, or kill somebody." And she said, "You will get into trouble," and he said, "You don't know what you are talking about." That her husband was working at the wood pile, and about that time Jack McKennon rode along on a sorrel blaze face pony, and as he passed the house Westbrook got on his horse and they rode off together.

Ben Priest testified that he noticed Westbrook had a pistol stuck in the waistband of his pants. Frank Taylor testified: That he boarded at Bidwell's boarding house in Sutter; and Westbrook had been boarding there about three weeks before the homicide, and they slept in the same room; that there were three beds in the room, George Williams and Bidwell's deaf and dumb boy occupied one of the beds, and Roswell Westbrook, another, and witness the other; that he went to bed on the night

of February 7th about 8 o'clock and was up during the night between 2 and 3 o'clock, and Westbrook did not occupy his bed that night.

G. B. Kimbrough testified that he lived near Norris, a town near the old Walls post office in Le Flore county; that his home was about two miles from old man Tomlinson's place; that he was there about midnight after Calvin Tomlinson was shot, and he heard the boy say, "I am killed," and he asked him if he knew who did it, and he said, "There was two men in the house, and one of them was Jack McKennon"; that the doctors were there at the time.

Several other witnesses testified that they heard him say before he died that one of the men was Jack McKennon.

It appears that Westbrook was arrested the next day, and Jack McKennon was arrested at Ft. Smith on February 9th. That on the night of February 10th they were placed in the same cell where a dictaphone had been adjusted between the cots on which the prisoners were to sleep. The wires from the dictaphone connected with the sheriff's office, about a hundred feet away from the cell. The prisoners' conversation was taken by the operators, and their testimony shows that the prisoners talked about the way the homicide was committed, and that the officers said the neighbors tracked their horses to the Tomlinson place and from there back to the town of Sutter. That Westbrook said to McKennon:

"One of them got killed; maybe both of them. I shot through that wall. These people didn't have any money in the house. I hit the old lady. I got him the first shot, I think, maybe, if I didn't the second. If we don't stay together we are all in. I promise you one

thing, the old man won't recognize anybody. I heard the old lady would swear that one of us shot at the old man too. You acted too damn fast. When they said, 'What do you want?' I said, 'We want your money, that's all.' "

### For the Defense.

Owen Herron testified that he lived at Calhoun and had known Roswell Westbrook for about two years, during which time he lived in Sutter; that Ben Priest lived about a half mile west of Sutter, and on Sunday evening, February 6th, he went there with Westbrook, and they stayed there about an hour; that he did not hear Westbrook say anything there that night about robbing anybody. On cross-examination he stated that Jack McKennon often stayed at his brother Finis Herron's house.

Finis Herron testified that about 1 o'clock on the 7th day of February he loaned Roswell Westbrook a large dark brown horse; that the next time he saw the horse was that night about 8 o'clock, at which time the horse was loose in his yard. On cross-examination he stated that he was commonly called "Skinny Herron"; that Westbrook told him that he wanted the horse to go out in the country and get something to drink; that Jack McKennon had been staying at his place for some time before that; and that he himself had worked in a sawmill for Jack McKennon off and on for five or six years.

Henry Kennedy testified that he saw Jack McKennon on the 7th day of February, about 4 o'clock in the afternoon, and another fellow with him, on the road about three miles from Sutter, and they were going towards Sutter.

Mrs. Molly Bidwell testified that with her husband, George Bidwell, she ran a boarding house in Sutter; that

Frank Taylor was a boarder, but he did not stay in the house on the night of the 7th day of February; that Roswell Westbrook boarded with them, but she could not say whether or not he stayed at her place that night. On cross-examination she stated that Roswell Westbrook's wife lived in the same neighborhood, but they had separated; that there were three beds in the room where Frank Taylor slept, one for George Williams and her son Johnny, one for Roswell Westbrook, and the other for Frank Taylor; that she did not see Roswell Westbrook from dinner time on the 7th until he came to breakfast on the morning of February 8th.

Johnny Bidwell, the deaf and dumb boy, testified he slept with George Williams the night of February 7th in one bed, and that Roswell Westbrook went to bed about 9 o'clock; and that he saw him in the room the next morning about 5 o'clock and Roswell Westbrook slept there that night.

George Williams testified that he worked at the Bidwell boarding house and slept with Johnny Bidwell the night of February 7th, but did not see Frank Taylor in the room there that night; that when he woke up the next morning Roswell Westbrook was lying there on his bed, but he did not hear Westbrook come into the room that night.

Sim Hamlin testified that he lived at Calhoun and saw Jack McKennon on the street near Brown's drug store about 4 o'clock in the evening of February 7th, and spoke to him.

The defendant, Westbrook, did not testify as a witness, neither did his codefendant, Jack McKennon, who it

appears entered a plea of guilty and was sentenced to life imprisonment in the penitentiary.

*Neal & Fleming* and *J. W. Calahan,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., *R. McMillan,* Asst. Atty. Gen., *Jones & Lester,* and *H. T. Church,* Co. Atty., for the State.

DOYLE, P. J. (after stating the facts as above). The plaintiff in error, Roswell Westbrook, and Jack Mc-Kennon were jointly charged by information duly filed in the district court of Latimer county on February 28, 1916, with the murder of Calvin Tomlinson, alleged to have been committed in said county on the 7th day of February, 1916, by shooting him with a pistol. Upon their arraignment on the 6th day of March, they took 24 hours to plead. On the 7th day of March, they filed a general demurrer to the information, which was overruled. Thereupon the defendants entered pleas of not guilty, and at that time the court fixed the time for trial for March 14, 1916. On the 13th day of March, the defendants filed in open court their application for a commission to take the deposition of one Bill Cole, a nonresident of the State of Oklahoma. Their joint affidavit filed in support of said application contained all the formal allegations required by law, and concludes as follows:

"That Bill Cole is a material witness in their defense, without whom they cannot safely go to trial; that said witness, Bill Cole, saw this petitioner in the town of Calhoun, Le Flore county, about 16 miles from the place of the alleged killing, about 7 o'clock on the 7th day of February, 1916, and remained with the defendant, Jack Mc-Kennon, from about 7 o'clock p. m., on said day, all night in Calhoun. And further defendants say that the testi-

mony of said witness is true and material in this cause, since it is alleged in the information that the defendants acting conjointly and together committed the crime of murder upon the person of Calvin Tomlinson in Latimer county, Okla., on said date, and the state relies upon proving that said crime was committed between 7 and 8 o'clock that evening. Affiants further say that said witness is a resident of the State of Arkansas and resides at No. 1008½ on Gar. Ave. Street, in the city of Ft. Smith, Ark.

"[Signed]    JACK MCKENNON,

"ROSWELL WESTBROOK."

The record shows, on the same day, the following proceedings:

"The Court. I understand from you, Mr. Church, that last Tuesday, which was the 7th day of this month, after Mr. Neal had served notice on you of his intention to make application for a commission to take depositions, that you at that time told him that you would waive the statutory notice to take the depositions, and that you would go with him at any time to take the depositions of this witness.

"Mr. Church (Prosecuting Attorney): Yes, sir; your honor. I told him that after he served the notice on me.

"The Court: Wasn't it understood between you and Mr. Neal that all process was to be taken out for tomorrow, and every witness in this case was subpœnaed to be here tomorrow by the state and the defense?

"Mr. Neal: Now, after this notice had been served upon Mr. Church, he came to me and said, 'Neal, I will waive that notice,' and I says: 'I don't ask you to waive anything. We want those depositions taken, and we want it done legally.'

"The Court: Application is denied.

"Mr. Neal: I would like for the court to state the ground of his denial in the order.

"The Court: I have a number of reasons for denying the application, and I don't think it is necessary to state them.

"Mr. Neal. We save an exception to the ruling of the court."

Thereafter, on the 15th day of March, the case was called for trial, and the defendants filed their motion for continuance. Their joint affidavit for continuance contained all the formal allegations required by law, and among others the following statements:

That T. L. Herron is a resident of Calhoun, Le Flore county. That on the 6th day of March, 1916, these defendants by their attorneys of record, Neal & Fleming, filed with the clerk of the district court of Latimer county a præcipe that a subpœna issue for said witness, and on the same day procured such subpœna, indorsed by the judge of the district court for service in Le Flore county to be issued. That the sheriff of Le Flore county made return of said subpœna that said T. L. Herron was not found "in my county." That the defendants further exercised diligence by procuring Owen Herron, a son of T. L. Herron, to go to Ft. Smith, Ark., where the said T. L. Herron was temporarily residing on account of his health and undertook to have the said T. L. Herron to come to Wilburton to attend the trial of this case. That said T. L. Herron is not present, but is confined to his room in the city of Ft. Smith, suffering from inflammation of the bowels, as is shown by the certificate of T. E. Jeffery, a regular practicing physician of the city of Ft. Smith, which certificate is attached hereto and made a part hereof. That said witness would testify, if present, as follows: That on the evening and night of February 7, 1916, he was in the town of Calhoun, Okla., and saw the defendants Jack McKennon and Roswell Westbrook about 7 o'clock p. m., on said day, and remained with the defendant Jack McKennon from about 7 p. m. in the evening until some time the next morning, sleeping in the same

bed with him the night of the 7th, and knows and will testify that the defendants were not at the home of W. S. Tomlinson in Latimer county between 7 and 8 o'clock on the night of the 7th day of February, 1918.

That there is absent from attendance of the court one Mrs. Covey, who is a resident of Calhoun, and for whose attendance a subpœna duly issued indorsed by the district judge, commanding the attendance of said witness, and the sheriff of Le Flore county served said subpœna upon the said Mrs. Covey by delivering a copy thereof to her in Calhoun on the 7th day of March, 1916, a copy of which subpœna and the return thereto is hereto attached. That said witness, if present, would testify: That she was present all the time during the conversation as is claimed by the state between Charity Covey and Roswell Westbrook, and that Roswell Westbrook at no time in her presence told Charity Covey that he (Westbrook) and the defendant Jack McKennon intended to rob any person. That said witness is sick and unable to attend the trial of this case, as is shown by certificate of physician hereto attached. That the testimony of said witness is true, and that defendants can prove these facts by no other witness in their power to procure, and that there is every reason to believe that the testimony of said witness may be procured by the next term of this court if this case is continued.

On the same day witnesses were called and testified in support of and against said motion for continuance.

The court in overruling the motion in part said:

"It seems, from the undisputed evidence in this case, that this woman (Mrs. Covey) has been suffering from pellagra for several months; and that it was known at least to one of the defendants that she was confined to her bed. When he was arraigned in this case, he must have known at that time that it was unreasonable to think that she would be here; that is, he couldn't reasonably expect that she would be here at this trial. If he was inter-

ested in getting her testimony before this court, it was his duty at that time to make an application for a commission to take depositions, and try to secure this woman's deposition, if she was able to give her testimony. There is no diligence shown to get this woman's testimony before this court at this time. Taking all things into consideration in this case and all of the evidence that has been introduced before me in the hearing, I will overrule the motion for continuance." (Exceptions allowed.)

Thereupon the defendants each demanded a severance, which is by the court granted, and the state elects to try the defendant Westbrook at this time.

On March 23, 1916, the jury returned their verdict finding the defendant Roswell Westbrook guilty of murder and assessing his punishment at death.

The petition alleges 54 assignments of error, but the foregoing transcript of the record presents the only errors assigned which we deem of sufficient merit to require discussion.

Counsel for the defendant insist "that the court erred in refusing to grant to the defendant a commission to take depositions."

The statutory provisions for the taking of depositions by the defendant in a criminal case are, in part, as follows:

Section 6036, Rev. Laws 1910: "When an issue of fact is joined upon an indictment or information, the defendant may have any material witness residing out of the state examined in his behalf as prescribed in this article and not otherwise.

"Sec. 6037. When a material witness for the defendant resides out of the state the defendant may apply for an order that the witness be examined on a commission

to be issued under the seal of the court, and the signature of the clerk, directed to some party designated as commissioner, authorizing him to examine the witness upon oath or interrogatories annexed thereto, and to take and certify the deposition of the witness and return it according to the instructions given with the commission.

"Sec. 6038. Application must be made upon affidavit stating: First. The nature of the offense charged. Second. The state of the proceedings in the action and that an issue of the fact has been joined therein. Third. The name of the witness and that his testimony is material to the defense of the action. Fourth. That the witness resides out of the state.

"Sec. 6039. The application may be made to the court or judge himself, and must be upon five days' notice to the county attorney.

"Sec. 6040. If the court or the judge to whom the application is made, is satisfied of the truth of the facts stated and that the examination of the witness is necessary to the attainment of justice, an order must be made that a commission be issued to take his testimony, and the court or judge may insert in the order a direction that the trial be stayed for a specified time reasonably sufficient for the execution of the commission and return thereof, or the case may be continued."

Counsel for the state contend that under section 6040, above quoted, the issuance of a commission to take the deposition of a nonresident witness rests in the discretion of the trial court or judge, and that no abuse of discretion appears in this case.

From the record it appears that the defendants, on the day they entered their pleas, served notice on the county attorney that they would make application to take the deposition of a nonresident witness, which application was supported by their affidavits, averring the facts

required to be shown under the statute. The county attorney offered to waive notice and the issuance of a commission, and offered to appear at any time to take the deposition of said witness. Counsel for the defendants, very properly we think, refused to accept this proposition. There is no inherent power in a court of record, to issue commissions to take depositions to be read in behalf of a defendant in a criminal case. The right to take and use the deposition of a nonresident witness in behalf of a defendant in a criminal case is statutory, and the procedure prescribed for taking and returning the same must be substantially complied with in order to make such deposition competent and admissible. We think the record shows a manifest abuse of judicial discretion in overruling the application of the defendants for a commission to take the deposition. In cases of this kind, where the defendant is on trial for his life, he should have the advantage of every right which the law secures to him upon his trial, and in a capital case, when notice is given and a proper affidavit for the taking of a deposition is made by the defendant and filed as soon as issue is joined by entering plea, it would be an abuse of discretion to deny an application properly made.

However, we think it is apparent from the record in this case that the errors complained of are not such as demand a reversal of the conviction. The application for the commission to take the depositions was made before the severance was demanded, and it appears that the testimony of said nonresident witnesses was material only for the defendant McKennon.

It is also insisted that the court erred in overruling the motion by the defendants for a continuance. We are inclined to think that, if counsel for the state refused to

consent to having the facts alleged in the affidavit for a continuance read and considered as the depositions of the absent witnesses, the trial court in the exercise of a sound judicial discretion should have postponed the trial until a later day in the term in order to give the defendants the necessary time to take the depositions of the absent witnesses. It appears that, after the severance was granted, this defendant did not renew the application and motion made jointly, and there was testimony upon the hearing tending to show that the witnesses were absent by the procurement and consent of the defendants. However, technical objections should not ordinarily prevent the granting of a motion for a continuance in a capital case, if necessary to a proper presentation of the defendant's case. It is the right of every person accused of crime to have a fair trial and compulsory process to compel the attendance of his witnesses, and this involves as a matter of course the time reasonably necessary to prepare for trial. The statute prescribes that civil cases in the district court shall not stand for trial until ten days after the issues are made up and no felony case should be set over the objection of the defendant within ten days after his plea is entered. Under the provisions of our Procedure Criminal (section 6003, Rev. Laws 1910), this court, in the furtherance of justice, has the power and authority to modify any judgment appealed from by reducing the sentence. However, that power should not be exercised unless it is apparent that an injustice has been done. *Owen v. State,* 13 Okla. Cr. 195, 163 Pac. 548; *Fritz v. State,* 8 Okla. Cr. 342, 128 Pac. 170.

To reverse the judgment of conviction in this case on the facts which are either admitted or so clearly established as to be beyond controversy would be not only

to delay justice, but to give no force to the statute which prescribes that such judgments may be reversed only when upon the whole record the court is satisfied that the substantial rights of the defendant have been prejudiced. However, if the guilt of the defendant was in any way left in doubt, or if we could believe that the defendant was prejudiced, we should feel it our duty to give him a new trial.

For the reasons stated, and taking into consideration the fact that the defendant McKennon, who it appears was the arch-conspirator, was, upon the recommendation of the prosecuting attorney, sentenced to life imprisonment upon his plea of guilty, we are of the opinion that in the furtherance of justice the judgment and sentence in this case should be modified to imprisonment for life at hard labor.

The judgment of the district court of Latimer county herein will be modified to the extent that the sentence will be changed from the infliction of the penalty of death to that of imprisonment in the state penitentiary at hard labor for life, and as thus modified the judgment is affirmed.

ARMSTRONG and MATSON, JJ., concur.