## LEVI YOUNG v. STATE.

No. A-3760.   Opinion Filed Aug. 9, 1921.
(200 Pac. 260.)

(Syllabus.)

Homicide—Murder—Death Penalty—Reduction. In a prosecution for murder, the evidence considered, and held sufficient to warrant a verdict convicting the defendant of murder, but insufficient, under the circumstances of the case, to warrant the extreme penalty of the law, and the judgment and sentence of death is modified to imprisonment for life at hard labor.

Appeal from District Court, Greer County; T. P. Clay, Judge.

Levi Young was convicted of murder and the death penalty assessed, and he appeals. Affirmed as modified.

E. T. Barbour, for plaintiff in error.

The Attorney General and W. C. Hall, Asst. Atty. Gen., for the State.

DOYLE, P. J. This is an appeal from a judgment and sentence of death rendered upon a verdict finding the plaintiff in error guilty of murder and assessing the death penalty. On the 1st day of December, 1919, the county attorney filed an information in the district court of Greer county, charging the defendant, Levi Young, with the murder of Tom Johnson, in said county on or about the 11th day of November, 1919. Upon arraignment it appearing that the defendant was destitute of means to employ counsel, the court appointed counsel to conduct his defense. On the 18th day of February, 1920, the defendant was put upon his trial. The jury returned their verdict finding the defendant guilty of murder as charged, and assessed his punishment at death. Motions for new trial and in arrest of judgment were duly filed, heard and overruled, and on the 28th day of February, 1920, the court pronounced judgment and sentence in pursuance of the verdict, from which this appeal was taken. When the appeal was taken an order was entered and served on the warden of the penitentiary staying the execution of the sentence, pending the decision of the appeal.

The only contention made is that the evidence does not justify the punishment assessed and is insufficient to support a verdict assessing the death penalty; that the punishment assessed is excessive, and is the result of passion and prejudice. The evidence in the case was substantially as follows:

Jewell Williams testified:

"On the 11th day of last November I was picking cotton for Mr. Tom Johnson; Levi Young was picking cotton for Mr. Johnson at that time; Mr. Snipes and his family and my mother, Mr. Davis, and Will Hughes, his wife and a lady by the name of Willie Bledsoe, were in the cotton field; Mr. Johnson

weighed my cotton and my little nephew's cotton, and Levi Young had his cotton weighed and his sack emptied; this was about half an hour before the trouble occurred; they had been knocking off four pounds on account of the sacks being damp; Levi Young spoke to me and said he didn't want to knock off as much as Mr. Johnson wanted to. He told Mr. Johnson that he would quit if he could not satisfy him, and Mr. Johnson told him all right he could quit; Mr. Johnson figured up Levi's cotton and told him how much it would come to and that he would pay him as soon as Sonny came; I took my sack and went back to picking cotton; in about ten minutes Levi Young came and began picking cotton and putting it in my sack, then he said, 'I see Sonny coming and, I will go back to the wagon and get my money and go and see about another place to pick cotton'; he went directly back to the wagon; then he went to his house, I saw him coming back to the wagon; my mother and Mr. Davis and Mr. Johnson's boys were at the wagon. I heard three or four shots fired.''

Hycianth Johnson testified:

''I am a daughter of Tom Johnson, the deceased; about four o'clock in the afternoon my father came to the house and got some money, then he returned to his work, about a half hour later I heard the shooting.''

Mrs. Jim Snipes testified:

''I was picking cotton that day for Mr. Tom Johnson; my little girl and my baby were with me; we were all picking right close to the wagon; Mr. Johnson weighed my cotton and my little girl's cotton, and Sonny came along and emptied our sacks, so we went back, then I heard a shot and then another. The cotton pickers scattered around and when I got to the wagon Mr. Johnson was dead, and Sonny was shooting, but I didn't pay much attention to that. The shots were pretty close together.''

Jim Snipes testified:

''Mr. Johnson had several negroes out there picking cotton, about 30 minutes before the trouble occurred Mr. Johnson came down and asked me for some money; I gave him $5; I

heard two shots before I looked up, the last shot 'sounded kinda dead like'; both shots sounded like a shotgun.''

Albert Johnson testified:

''My age is 21. I am the son of Tom Johnson, the deceased. My father took a bale of cotton to the gin that morning; this nigger had been picking there a week before; I don't know whether or not my father had paid him; I was on the wagon tramping cotton when my father and this negro reached the wagon; my father said, 'Sonny, this nigger sassed me and has been talking sassy and he refuses to take an order on Ball for his money;' the defendant did not say anything; I told my father I would go to the house after the money to pay him off; my father said, 'No, I will go, you tramp the wagon, I will be back in a few minutes,' and he turned and walked towards the house; it was about 200 yards to the house; Levi Young started towards the negro house, which is a little over a half a mile from the wagon; he walked fast and in ten or 15 minutes he returned; my father had not come back at that time; Levi Young was carrying a shotgun; when he reached the wagon my father was standing near the end of the tongue; I was weighing Davis's cotton; Lizzy Williams and my two little brothers were standing there; Levi Young said, 'Have you got that money?', My father answered him and said, 'Yep', Davis' sack of cotton weighed 61 pounds, and I just turned to preacher Davis and asked him if that was right and as I hung the pea up I saw my father had his pocket book in his hand and a roll of bills; then I heard the shot fire; I turned and the defendant was running back and my father was in a stooping position; I could not see his right hand at the time, but later I saw a pistol in his hand, he fired the pistol, the defendant fired three shots, he was 30 or 40 steps away when the third shot was fired; I got my father's gun and started shooting at the defendant; as I pursued the defendant I fired ten shots; I followed him something like half a mile, the shot entered the right breast and cut the right lapel of my father's coat, the wound was an inch and three quarters in diameter; my father had been carrying that pistol since the cotton picking season opened; it was a 32 double-action Colts.''

H. Davis testified:

"I had been picking cotton a couple of weeks, something like that for Mr. Johnson, Albert Johnson was weighing my cotton when the shooting occurred; Levi Young was standing some distance off; Mr. Johnson was pretty close to the wagon tongue; I saw him walking with something in his hands, or coming out with it, it glimmered, a book maybe or something of that kind; Levi Walked up, he had a gun and Mr. Johnson asked him, 'Did he want his money', after that I heard a shot, the shooting was all done so quick I could not distinguish the shots; I turned and looked, Mr. Johnson was falling; Albert Johnson got his father's gun and went after the defendant; Mr. Johnson's clothes down at his right side, about the pocket somewhere, was burning and I took damp dirt and put it out."

Elmo Johnson testified:

"I am eight years old; I remember when my father was killed; I was about a step from him; Levi Young shot him when he was counting out his money; my papa ran under the wagon tongue and Levi Young ran backwards; I found the pocket book where my papa was standing when he was shot; I just heard three shots at the wagon, something like that."

W. D. Henry testified:

"I tracked the defendant into Altus that night and arrested him and brought him to Mangum."

The testimony of the defendant in his own behalf is as follows:

"I am 20 years old, my people live at Waxahachie, Texas; I had been working for Mr. Tom Johnson about two weeks; I stayed with Jack Hughes in a house northwest of where the cotton wagon stood; that afternoon Mr. Johnson was weighing the cotton; and he said, 'I am going to knock off more for the sack'; I had agreed to knock off four pounds because it was damp, and he says, 'If you can't do any better get off the farm'. I asked him to pay me what he owed me; he said when his son came back he would pay me; it was $5.20; I told him all right I would wait; so I went down where Jewell Williams was pick-

ing and picked with her until his son came back, then I went back to the wagon to get my money; Mr. Johnson and his son were there; he told his son to get down off the wagon and he said, 'This nigger is trying to be sassy'. I never said nothing, I asked his son to go to the house and get my money, and Mr. Johnson said, 'No, he would get it', then he went to his house and I went to Jack Hughes' house; Jack's wife was there; I stayed about thirty minutes and came back with Jack Hughes' shotgun; I said, 'Mr. Johnson, give me my money, please sir,' he had his pocket book in one hand, he said, 'All right, do you want your money, I will pay you', and he pulled his pistol from his pocket. I jumped back and shot at him and he fired a shot. It was done so quick I do not know who fired first; I fired just one shot; because I thought he was going to kill me; I never shot the gun any more, and Mr. Johnson only fired one shot; Albert Johnson, his son, took the revolver from him and when he fired the first shot at me I was 20 steps from him, he fired four shots at me there, then he went back to his father and got some more cartridges and came back and fired six more shots at me; I just tried to get out of the way; when I fired that shot I thought Mr. Johnson was going to shoot me."

Jewell Williams, a witness on behalf of the defendant, testified:

"I was about 100 yards east of the wagon; it seems to me I heard the sharp report first, the first shot sounded like a pistol."

Upon a careful examination of the record we find no error committed on the trial of the case that would require or justify a reversal. The court in its charge submitted the issues of murder, manslaughter in the first degree and self-defense. The instructions fairly submitted the law of the case to the jury. The guilt or innocence of the defendant was a question for the jury to determine, and they have determined it against him upon testimony sufficient to sustain their verdict finding him guilty of murder.

It follows that the sole question presented for the decision of this court is, should the judgment and sentence be modified to life imprisonment? Our Penal Code provides that any person convicted of murder may suffer death or imprisonment at hard labor in the state penitentiary for life, at the discretion of the jury. (Section 2319, Rev. Laws.)

Our Code of Criminal Procedure provides that:

"The appellate court may reverse, affirm or modify the judgment appealed from." (Section 6003, Rev. Laws.)

It was said by this court in the case of Fritz v. State, 8 Okla. Cr. 342, 128 Pac. 170, that this provision of our Criminal Code makes it the duty of this court to review the record, and in a proper case, if necessary in the furtherance of justice, modify the judgment so as to prevent the imposition of punishment which the evidence does not warrant.

In the case of Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613, it is said:

"By this provision it seems to have been the intention of the Legislature to vest this court with power to modify the judgment, when such a course would be in furtherance of justice and conduce to the humane administration of the law. In a capital case it is the duty of this court to examine, with the greatest care, the whole record in favor of life, and review the case upon the merits to determine whether justice requires a modification of the judgment to imprisonment for life."

After a careful investigation of the facts in this case we are unwilling to lend the sanction of our approval to inflicting the death penalty, because in our opinion the evidence does not justify the highest punishment authorized by the law. This was not a lying in wait assassination, or a homicide committed in the commission of a felony. The dispute arose over wages due from the deceased, a white man, to this defendant, a negro; both were armed and the negro killed the white man.

The prejudices that are engendered in cases of this kind among our race is a matter of common knowledge, and this may have influenced the jury to assess the extreme penalty. A capital conviction should be above suspicion of any partiality, passion or prejudice.

Our conclusion is that the punishment assessed is excessive and that justice requires a modification of the judgment and sentence of death to that of imprisonment in the penitentiary for life at hard labor.

The judgment of the district court of Greer county herein is so modified; as thus modified the judgment is affirmed.

MATSON and BESSEY, JJ., concur.