ROGER W. CUNNINGHAM v. STATE.

No. A-9796.   Aug. 28, 1940.

(105 P. 2d 264.)

Herbert K. Hyde, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis R. Morris, Co. Atty., and Walter Marlin, Asst. Co. Atty., both of Oklahoma City, for defendant in error.

JONES, J. The defendant, Roger W. Cunningham, was charged in the district court of Oklahoma county with the offense of murder, was tried, convicted and sentenced to death by electrocution in the state penitentiary, and has appealed.

This case was submitted to this court on the case-made with petition in error attached. No appearance was made at the time the cause was set for oral argument by either the state or the defendant, and no briefs have been filed.

The only defense interposed in the trial of said case was the defense of insanity. The defendant contends in his petition in error before this court that the punishment is excessive and should be modified by a reduction to a sentence of life imprisonment in the state penitentiary.

The undisputed facts established by the prosecution were that the defendant Roger W. Cunningham had married the deceased, Eudora Cunningham, in 1935. At the time of their marriage, she was a school teacher; and he was employed as an assistant instructor in the Central High School at Oklahoma City and also a night job at the Biltmore Hotel. Later he secured a job as an inspector for the Federal Housing Administration in connection with the loans which were being made on newly built houses in Oklahoma City and vicinity. He was acting as such inspector at the time of the tragedy herein.

The stepfather and mother of the deceased were Mr. and Mrs. Joel P. Stokes, who were partners in the Stokes Realty Company. They had been instrumental in the development of the Twin Hills addition near Oklahoma City and had built their own home in that addition. During the time the Stokes Realty Company was building the various houses in this addition, the defendant was employed by them in connection with this work. He made out reports, kept the time cards on the employees, and checked the material used in the construction of the houses in said addition.

During this time, the defendant and his wife (the deceased) built a home adjoining the home of the Stokes at an approximate cost of $18,000. Practically all of the money necessary for the construction of this home was borrowed from a loan company, and payments on this loan were to be made monthly by the defendant.

In December, 1938, the defendant, without ever having previously discussed the matter with his wife, told her that he had been to see Clarence Black, an attorney in Oklahoma City, and arranged to get a divorce. That he wanted her to go to this attorney and sign a waiver so that a divorce could be had. The wife at that time went over to her mother's and informed her of the defendant's proposal; and Mrs. Stokes, the mother, talked to the defendant to try to learn the trouble. He refused to tell her why he felt that he and the deceased should be divorced.

The mother testified that she asked the defendant if Eudora had done anything or had refused to do anything to cause him to want to divorce her. She further testified:

"He said that she hadn't done anything, and that there wasn't anything. That he just thought that we would all be better off and happier; she would be happier, he would be happier, and we would be happier. He wouldn't talk very much and was reluctant to discuss it; and I argued about it and tried to get him to tell me; and he finally said, well, he wouldn't make any promises; he didn't know, and that he would know in a short time whether he wanted to go on; and with that, he left and went on upstairs."

Eudora Cunningham was last seen alive by her parents on Sunday afternoon, March 5, 1939. On the evening of Monday, March 6, 1939, Eudora Cunningham disappeared. The next morning, the defendant called the principal of the Foster School in Oklahoma City, where the deceased worked as a librarian, and told him that she had been

called to Illinois on account of illness in her family and that she would probably be gone a week.

The Stokes Realty Company had a personal injury case set for hearing before the Industrial Commission on Tuesday, March 7th, in which case the defendant was a necessary witness. About 10 o'clock a. m. on Tuesday, March 7th, the defendant went to a lawyer's office in Oklahoma City and discussed the testimony to be given by him in said case. That afternoon he testified as a witness before an inspector for the Industrial Commission. After this case was concluded, he told the parents of his wife for the first time that Eudora was not at home. He told her parents that he met his wife after school on Monday, ate dinner and then he took her to the Criterion Theater, and he went to his office to work. That after the show he met her and drove home. That when they arrived at home, she went upstairs and was packing her bags and said she had made up her mind that it was too embarrassing to stay there where her parents were, for them to have to take her back and forth to school and furnish her with meals, and that she had decided to go to California. That she packed three bags of her clothes, and he took her to the Sante Fe Station and let her out, and that he took her bags out of the car and set them down for her. That he then drove down to a parking place in front of the Kingkade Hotel; that he sat there a few minutes and then drove back to where he had left Eudora, but that she was not there. That he looked around on Grand avenue and Reno street and under the underpass, and was unable to find her, and that he had gone on home. After telling this story, the defendant represented to the parents that he was making every effort to locate his wife; that he had talked to different taxi-drivers and railroad and bus men and others in an endeavor to find some one who had seen her.

The defendant continued his work for the F. H. A. that week, going to Lawton on Wednesday to make an inspection. While at Lawton he called the Stokeses and inquired as to whether they had heard from the deceased. Mrs. Stokes went to the bank where Eudora deposited her money and found that the defendant had just cashed a check for $50, dated March 6th, and which was signed by the deceased, which left her a balance of only $40 in the bank. That no other money had been withdrawn. On Thursday the defendant and Mrs. Stokes had lunch together, and that afternoon he took her on a tour of inspection that he had to make.

Things continued in much this manner for several days, with the defendant insisting that the parents would hear from their daughter. At the request of the defendant, the officers had not yet been notified of the disappearance; but the parents had made a thorough check of everything they knew to ascertain her whereabouts and had called many of her relatives in distant places.

Later, while the defendant was gone from home, Mrs. Stokes obtained a passkey and went over to his house and went up in the attic where the deceased stored her bags and her clothes to see what had been taken. She discovered at that time only the footprints of a man in the dust-covered floor of the attic and found that many of the dresses and articles of clothing which her daughter would have taken if she were going on a trip had not been moved. On Wednesday, March 15th, Mrs. Stokes went to the county attorney's office and outlined the circumstances of the disappearance of her daughter. The next day, the defendant came with Mr. and Mrs. Stokes to the county attorney's office and repeated practically the same story there that he had related to the parents about the disappearance of his wife.

On March 18th, Mrs. Stokes received a telegram from Los Angeles, Cal.: "Am getting along fine Hope you are too Tell Roger love. Endora."

After the receipt of this telegram, an investigation was made which disclosed that it was sent from Los Angeles, Cal., by one Monty Dillingham. Dillingham had sent the telegram in response to a letter which he had received from the defendant, which reads as follows:
"Spike:

"Please send this straight, just as fast as you can get to a Postal or Western Union sub-station * * * *where you are not known.* Destroy this letter and keep this to yourself. I will explain it all to you someday.

"Please—please—do this for me.

"Roger———

"Keep the change—if any.

"I sure hope things are looking better for you and that you have a chance to make it out there. You may have to find a spot for me. Do not tell Harry or Stormy.

"Rog."

After these facts were discovered, the defendant was taken into custody on March 20th. The defendant still maintained that he knew nothing more about the disappearance of the deceased than he had related, but that he had had the telegram sent to ease the minds of the Stokeses until Eudora could return.

In connection with the duties of the defendant as an inspector for the F. H. A., he had occasion to inspect some houses which were being built at the time of the homicide in the 3600 block on West Eleventh street. A sewer ditch had been dug about the 1st of March through the 3600 block, east and west, between Eleventh and Park streets. In the investigation by the officers of the defendant's actions prior to his wife's disappearance, it was learned that he had been seen looking at this sewer ditch

on the Friday prior to his wife's disappearance on Monday evening. The evidence showed that the company constructing the sewer line had filled the sewer ditch with the exception of a short distance around the manholes on Monday, March 5th, and they had completed the filling of the ditch on Tuesday morning, March 7th.

The officers spent some time probing in this ditch with long, steel rods, but had been unable to find the body. On the night of March 24, 1939, the officers related to the defendant all of their findings; and at that time, the defendant took a piece of paper and pencil, and drew a map of the area where the sewer ditch had been constructed, and marked the place on the map where he told them the body of the deceased would be found. At the bottom of the map, he wrote the following: "Take her to Street and Draper's." After he had showed the officers this diagram, he wrote out in his own handwriting a confession of the murder, which reads as follows:

"March 24, 1939

"Monday night March 6th, 1939, about 7:30 p. m. I strangled my wife Eudora and buried her in a partially filled sewer ditch in the 3600 west, between 11th Street and Park Place. May God have mercy on my soul.

"After this I drove to the Post Office Bldg. and stayed till 11:00 and then I went home and packed three traveling bags with her clothes and took them to the south end of the May Ave. bridge and threw them off on the west side of the squatter shacks—then I drove home.

"Roger W. Cunningham

"I make the above statement of my own free will. No threats have been made against me and no promises made to me.

"Witnesses                          "Roger W. Cunningham
    "Lewis R. Morris
    "George Goff
    "Claude Tyler"

After this confession was made, the officers excavated the ditch at the point described in the map and found the body of the deceased. The scarf was still around her neck; and the evidence showed that she had been choked to death. The clothing contained in the three bags which the defendant had thrown off near the river at the south end of the May avenue bridge was recovered from the occupants of a squatter camp at that location.

The defense introduced evidence to show that the defendant was a graduate of Central High School of Oklahoma City. That while he was a student in the high school, his conduct and actions seemed peculiar; that he was 515th among the 525 graduating students in 1923. He attended the University of Oklahoma; and while a student there in 1924, contracted a case of syphilis. That he took treatment for this disease in 1924 and 1925 from Doctor Ben Cooley of Norman. He left school there and later enrolled in school in Kansas. He continued to take treatments for this disease, and was pronounced cured in 1927. He married at that time and divorced his wife about a year and a half later. The defendant's father was a prominent physician in Oklahoma City. In 1932, the syphilis reappeared in the defendant, and he was sent to the State Hospital at Norman for treatment as a private patient under the name of C. Rogers. He received treatments at that institution at various times from 1932 to the early part of 1935. At one time he spent six months there as a patient, receiving treatment. After the disease was apparently arrested in the early part of 1935, the defendant married the deceased, Eudora Stokes. No further treatments were taken by the defendant after his marriage to Eudora so far as the record discloses.

The evidence shows that during a part of the time that the defendant was a patient at the State Hospital,

he attended school at the University at the same time. The defendant introduced Dr. James A. Willie as an expert psychiatrist, who testified, in response to a hypothetical question submitted by the attorney for the defendant, that in his opinion the defendant was insane at the time he killed his wife. To refute this, the state introduced the testimony of Dr. George L. Borecky, who testified that he had taken a Wassermann test of the defendant after he was placed in jail and that the test was negative and that he had had the defendant under observation since the 29th of March, and that in his opinion the defendant was sane at the time of the trial and at the time of the homicide on March 6th.

These two doctors were the only expert witnesses who testified concerning their opinion of the sanity of the defendant. Other medical testimony was introduced concerning the effect of the disease of syphilis on the human mind. This proof was to the effect that about 15 per cent. of all the people who contract the disease of syphilis become affected in their central nervous system. That when the disease got in the central nervous system it could be arrested but never cured. The defendant received treatment and injections in his spinal fluid for this disease, and also was given the malarial treatment at the State Hospital. The proof shows that the defendant had the disease in his central nervous system during the time of his treatment in 1932 and 1933. After June 7, 1933, the tests that were taken of his blood and spinal fluid for syphilis were negative.

Lay witnesses connected with the F. H. A. testified that the defendant appeared sane in his work with them, and that subsequent to the homicide he continued to make his written reports concerning the construction of various

houses which came under his supervision the same as if nothing had happened.

The testimony showed that on the Friday following the homicide on Monday, the defendant had a party of men at his home where they played poker all night.

A person cannot but conclude from an examination of this record that the defendant was wholly without emotion. But the evidence does not fairly permit any other conclusion than that the homicide was the willful, deliberate and premeditated act of a person who understood the nature and consequences of his act.

We have held that the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has mental capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and consequences of such act. Alberty v. State, 10 Okla. Cr. 616, 140 P. 1025, 52 L.R.A. (N.S.) 248.

The defense of insanity, at best, presents a question of fact for the jury; and when they have settled that question without passion or prejudice in accordance with the evidence and the instructions of the court, it is not the province of this court to disturb the verdict of the jury. The instructions covering the theory of insanity were as favorable to the defendant as the law permitted; and it is not contended that the court committed any error in this regard.

Unquestionably, the disease which had afflicted the defendant had a demoralizing effect on him. But to this court there is nothing in the record to show that he did not know right from wrong at the time of the homicide. All of his movements, both before and after the homicide, showed that he fully understood what he was doing and

the effect of his acts if his guilt was learned. The manner in which he planned the death, even to the minutest details, together with the stories he manufactured to cover his wife's disappearance, all indicate to this court that he had gotten tired of this young girl, and being wholly without emotion, chose to put her to death by strangulation. That he thought by burying her body many feet underground in the sewer ditch that she would never be discovered; and accordingly, he would never be punished for his crime.

It is very unfortunate that something has broken loose in this young man's moral fiber to cause the commission of this offense. The Legislature in its wisdom has provided for the imposition of the extreme penalty in certain classes of cases at the discretion of the jury. Every guaranty afforded a defendant accused of crime has been accorded the defendant. Every precaution was taken to see that he was given a fair and impartial trial. Counsel for defendant has pointed out nothing to this court that he contends was error in the proceedings during the trial of said cause; and after a very careful examination of the entire record, we have found none.

Our Code of Criminal Procedure, section 3204, O. S. 1931, 22 Okla. St. Ann. § 1066, provides:

"The appellate court may reverse, affirm or modify the judgment appealed from, and may, if necessary or proper, order a new trial. * * *"

We have held that by this provision, this court is vested with the power to modify a judgment when such a course would be in the furtherance of justice and merited by the evidence. Fritz v. State, 8 Okla. Cr. 342, 128 P. 170; Anthony v. State, 12 Okla. Cr. 494, 159 P. 934; Owen v. State, 13 Okla. Cr. 195, 163 P. 548; Westbrook v. State, 14 Okla. Cr. 423, 172 P. 464; Chambers v. State, 16 Okla.

Cr. 238, 182 P. 714; McConnell v. State, 18 Okla. Cr. 688, 197 P. 521; Young v. State, 19 Okla. Cr. 363, 200 P. 260; Phillips v. State, 27 Okla. Cr. 108, 225 P. 180.

This young man comes from a good family. Evidently he has many friends who have heavy hearts because of this tragedy. The law regards human life as the most sacred of all interests committed to its protection; and no more solemn duty can be imposed upon the courts than the duty of protecting, and the duty of taking, human life.

We have given this case that careful consideration which its importance and its solemn consequences to the defendant demand. We cannot find anything in the record that might mitigate the offense or justify this court in the due administration of justice in interfering with the verdict of the jury and modifying the same to life imprisonment. The judgment is accordingly affirmed.

The time originally appointed for the execution of the defendant Roger W. Cunningham having passed pending this appeal, it is ordered, adjudged and decreed by this court that the judgment and sentence of the district court of Oklahoma county be carried out by the electrocution of the defendant Roger W. Cunningham by the warden of the state penitentiary, at McAlester, Okla., on Friday, the 15th day of November, 1940.

DOYLE, P. J., and BAREFOOT, J., concur.