HAROLD E. SHIMLEY et al. v. STATE.

No. A-10946.   July 14, 1948.
(196 P. 2d 526.)

David Tant and Herbert K. Hyde, both of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J.   This is an appeal by Harold E. Shimley from a conviction for the included crime of kidnapping (Title 21, § 741, O. S. A. 1941, with a maximum penalty of ten years) and sentence thereon to a term of three years in the penitentiary.   The charge as laid in the information is for kidnapping for the purpose of extortion under Title 21, § 745, O. S. A. 1941, carrying a maximum penalty of death and a minimum penalty of ten years in the penitentiary.

Shimley does not contest the correctness of the verdict of the jury as to his guilt.   He registers no complaint that the trial judge, Albert C. Hunt, did not give him a fair and impartial trial.   He assigns no errors of law occurring during the trial as the reasons for this appeal.   His sole and only ground for this appeal is that the sentence of three years in the penitentiary, which the jury inflicted, is excessive, when measured by the sentences of his codefendants of one year in the penitentiary.   This contention is predicated upon his claim that the evidence showed that the defendants were acting jointly and together.   He says that the reason for the difference in the sentences inflicted upon him and his codefendants is by reason of passion and prejudice which he aroused in an opening statement which he made before the jury in his own defense.

When this matter was first orally presented to the court, it was urged that the difference in penalty occurred because of the passion and prejudice aroused by the opening statement made by Shimley in his own defense. In this connection the defendant Shimley insisted that he be permitted to make an opening statement. The court permitted him to do so. He made an extended argument which he felt sure would be to his advantage. He now feels it was prejudicial. He seeks to invoke in his favor the rule that the court has repeatedly announced that, where the punishment appears excessive in part resulting from passion and prejudice, the judgment and sentence will be modified by reducing the sentence. Deal v. State, 59 Okla. Cr. 385, 60 P. 2d 408; Cunningham v. State, 70 Okla. Cr. 131, 105 P. 2d 264; Green v. State, 70 Okla. Cr. 228, 105 P. 2d 795; Johnson v. State, 70 Okla. Cr. 270, 106 P. 2d 149; Greer v. State, 74 Okla. Cr. 286, 125 P. 2d 225; White v. State, 76 Okla. Cr.. 147, 134 P. 2d 1039; Kidd v. State, 76 Okla. Cr. 213, 136 P. 2d 210; Daves v. State, 77 Okla. Cr. 343, 141 P. 2d 603, and numerous other cases not cited. We find these cases, however, are cases where the passion and prejudice engendered was by the state for the purpose of influencing the conviction of the defendant. We found no cases where the defendant by an opening statement or argument made in his own defense had been granted relief where his own acts engendered passion and prejudice against him. The state and the court should not be held responsible for the acts of the defendant in the trial of a case resulting to his prejudice. We can think of no more abortive procedure in the administration of justice than to permit the defendant to become master of the trial and by his own conduct, without provocation, voluntarily inject into the trial some prejudicial

word, or act, and then on appeal complain of the same as a means of obtaining a reduction in the penalty imposed or for effecting his release. If such were the case no defendant would be tried without extending his full length and then some, to bring such an abortive situation. The court must hold on this situation that in the interest of orderly courtroom procedure, the defendant is bound by the same hard and fast rule of fair play as is the state in the trial of a criminal case. The state cannot play fast and loose in a trial, neither can the defendant. He cannot precipitate error in his own defense, then use it as a springboard to his own advantage. The results in the trial of a case should be dependent upon the issues of fact. When this appeal was first presented to the court, we were somewhat impressed with the argument on this ground but upon mature consideration it becomes apparent that it is wholly without merit.

Moreover, an examination of the opening statement made by Shimley does not impress us as being prejudicial to his rights, but, on the contrary, it appears in every line and syllable a masterpiece of design intended to create prejudice in his own favor—a grand piece of self-serving declaration designed to relieve the juror's minds of the motive for this crime, to establish that he was not in the whisky business, but was a family man even though a gambler by profession. How it can be said that this opportunity afforded by our system of jurisprudence was anything but an advantage to him, we cannot see. However, if it proves a disadvantage he and he alone is responsible. If we are wrong in our impression that it was not prejudicial to him, still he cannot hold the state responsible, to his advantage, for the error he himself injected into the trial. There would be

no end to misconduct on the part of defendants in trial procedure if such a rule were established. If such a rule were established it would mark the end of orderly court-room procedure. The administration of justice would degenerate and become a mere travesty. We therefore cannot follow Shimley's contention in this regard.

The defendant further contends that his three years sentence is excessive when measured by the one year sentence meted out to his codefendants, since the evidence shows that they acted jointly and together. In this connection, to determine what the basis was for the difference in penalty, we have carefully reviewed the 1115-page record which includes the justice court preliminary proceedings, the latter being offered in evidence by the defendant for impeaching the testimony of the state's witnesses. This was done by the defense in a sort of flourish "for whatever it is worth" attitude. The defense, however, did not take the pains to point out wherein it was impeaching. After an examination of the same we believe it would have been better for the defense to have left it out. As to the main thread of the story and principal acts complained of, it is highly corroborative of the complainants. This record discloses that Shimley and his codefendants acted jointly and together as he contends, but it shows more. It shows that they did not act in equal roles. Moreover, it presents a picture of the defendant's attempt to eliminate by rule of tooth and claw W. J. Kelley, a competing bootlegger, with gambling facilities. It shows they tried to muscle in, push him out, and take over his business. It presents a picture of racketeering in unlawful enterprises culminating in the kidnapping of W. J. Kelly and Claudia Jo Sam.

In the foregoing connection, it is well that we briefly review the facts as found by the jury from the record. In substance, the facts were W. J. Kelly owned and operated two establishments, one a telephone whisky bootleg distribution point and a suburban eating, drinking and gambling dive known as the San Diego Club. He was apparently doing well financially in both places. This record discloses it was the desire of Shimley and one of his codefendants to take over his whisky business and his/ gambling facilities. Shimley and one of his codefendants, the record discloses, called on W. J. Kelly and told him he had sold a one-half interest in his club to Shimley. This apparently was much of a surprise to Kelly. He denied this. Moreover, he declined to sell. He was then told that if he did not lease both his club and telephone numbers to some other parties to be named by Shimley's associates, his place would be raided by the officers and torn up. This he also declined to do. Next he was offered $2,000 for his phone numbers and $4,500 for his club. This he further declined. From then on the record shows he had difficulty with Shimley, the gambler, and his associate, who claimed to be king of the Oklahoma City bootleggers. When he could not be moved to sell or lease, his San Diego Club was raided and chopped up just as he was warned it would be.

The record then reveals that W. J. Kelly became involved with one of Shimley's codefendants and other parties from Chicago in a whisky purchase deal. Kelly claimed they did not deliver the whisky to his cache, and refused to pay for it. Kelly was corroborated in the claim that the whisky was not delivered, by a "Cowboy" Stallings who was in charge of his cache. He re-

ceived this information over the telephone while the Chicago whisky runners were present in the San Diego Club seeking payment for the whisky. They claimed they had delivered the whisky and that Kelly refused to pay for it. Thereafter, the Chicago whisky peddlers and Shimley decided to take the law into their own hands to apparently accomplish two objectives: first, to collect the money which they claimed was due for the whisky, and, second, to acquire his places of business or to drive him out of business in Oklahoma City. The record shows that on February 10, 1947, about 1:30 in the morning, Shimley and his two Chicago codefendants came to W. J. Kelly's whisky dispensary and, with force of arms, forced Kelly and Claudia Jo Sam, his telephone girl, together with Fred Vehmeyer, deliveryman for Kelly, into an automobile then being driven by Shimley. The record further discloses that before they drove away they decided there was no need to take Vehmeyer and at that point he was kicked and released and then they drove off. Vehmeyer reported to the Oklahoma City police department that Willie J. Kelly and Claudia Jo Sam had been kidnapped. After driving around Shimley and his codefendants finally stopped at a tourist court at 39th street and Portland avenue in Oklahoma City where one of his codefendants was registered and had quarters. Here W. J. Kelly was stripped of $740 and demand was made of him to produce his diamond rings. When he could not produce the rings and refused to tell where they were, Shimley hit him over the eye with the butt of his pistol knocking him down and making a bloody wound. The record shows that Shimley wanted to kill both W. J. Kelly and Claudia Jo Sam; that he became so violent and insistent that his associates took his pistol away from him. It shows he left and

later returned with another pistol, again threatening to kill them. The record reveals that his codefendants also took this pistol from him. The case-made shows that he then begged for the return of his gun so he could kill them. It appears from the evidence that a sum of money, first $10,000, then $5,000, and then finally $4,500 was demanded of W. J. Kelly as the price of his release. The record also shows an attempt was made to collect for the whisky allegedly delivered to Kelly by the Chicago men. It further shows that Kelly was taken to a nearby telephone in an attempt for him to raise $4,500 from two friends, Charlie Hughes and O. P. Estes. This these men corroborated in their testimony. Then it was demanded that he give a deed to the San Diego Club, leave town and not return. The case-made shows that they then moved the base of their operations to their automobile driving around Lake Overholser and Lake Hefner. It reveals that Shimley threatened W. J. Kelly and Claudia Jo Sam with disembowelment and death, stating he would put rocks in their bowels and sink them in the lake, that he had killed seven other men, the last one being left in a bathtub. Finally they returned to the tourist court and discovered by radio Mrs. W. J. Kelly had filed kidnapping charges against them. Boasts were made during all of this procedure that they could effect their release upon arrest almost immediately upon being arrested. While being fingerprinted by Undersheriff Ross Biggers and Herman E. Mozer, fingerprint expert from Tinker Field Air Base, Oklahoma City, they testified, Shimley said that "I hit him over the head, I put that mark on him", indicating a space on the forehead, "with my pistol. The big mistake that I made is that I did not kill the son of a bitch like I intended to, like I started in to do". The evidence re-

veals that none of Shimley's codefendants were so vicious or willing to go as far as he did. The record pictures him in the leading role. It is therefore apparent that the jury believed that was his role and that he deserved a greater penalty.

When the matter was orally presented to this court a very sketchy picture of the situation was before us. We now have all had the benefit of a careful review of the record. It clearly appears why the jury gave Shimley three years instead of one year. Under the facts presented by the record, the jury could have found Shimley and his codefendants guilty of the greater offense of kidnapping for the purpose of extortion. The record so supports such a finding, and justifies a much greater penalty than that inflicted on any of the defendants. They are most fortunate that the jury did not find them guilty of the greater offense carrying not less than ten years nor more than the death penalty. We can only presume why they did it. We suspect it was because W. J. Kelly and Claudia Jo Sam were both so disreputable and common bootleggers. We believe it was because they believed it to be only a gang war, one set of gangsters, bootleggers and gamblers preying upon another set of gangsters, bootleggers and gamblers. Of this, this court cannot take cognizance. Of course, they were without legitimate recourse, since the enterprise in which they were engaged is unlawful; resort to the courts could not be had for the collecting of a debt, if any, Kelly owed. But society cannot afford to permit such people to resort to kidnapping, either as an instrument for collecting bad bootlegging debts or as the means of eliminating a competitor. As to the latter, even in legitimate business the law does not recognize a practice

designed to get a competitor. Surely, there can be no reason for extending bootleggers and gamblers a practice we do not afford legitimate business. Competition in legitimate American life has been regarded as the life of trade. Quite obviously, illicit enterprise does not desire competition. The boldness which prompts its invasion of prohibited fields no doubt prompts its resort to the rule of tooth and claw to eliminate competition. Likewise, the boldness which prompts such enterprise also inspires it to cheat the provider of the commodities of the unlawful traffic. By the same urge, illicit traffic in unlawful contraband prompts violators to take the law into their own hands and resort to threats, kidnapping, assaults and battery and some times murder in collecting its price or in exacting its self-instituted penalties. Such conduct cannot be tolerated under the law. Kidnapping is like a malignant growth and vicious contagion. It must be dealt with even among bootleggers and gamblers, lest it spread to other areas. Odious as it may appear, the jealous mistress of the law, on occasions, must find herself affording protection to those unworthy of it, if an orderly society is to be maintained. Gang wars should never be countenanced by any community, for any purpose. We shall not assume a compromising attitude concerning such practices even among bootleggers., To do so, would be to embolden them and nurture the first foul germs of anarchy. Therefore, because of the wholly iniquitous, vicious, contagious and anti-social nature of this crime, as revealed by a careful examination of the record, in the absence of a charge of the denial of a fair trial, assignments of errors of law and in the face of the lienency of the sentence by the jury, clearly, we are not justified in temporizing or compromising the jury's verdict. The record

in this case does not justify it. As was said in Jones v. State, 10 Okla. Cr. 216, 136 P. 182, 137 P. 121, 122:

"While this court has the power to modify a judgment and reduce a sentence inflicted by the jury or trial court, this power cannot be arbitrarily used but can only be exercised where it appears from the record that an injustice has been done in assessing the punishment upon him."

Under the circumstances as revealed by this record and the sentence herein inflicted, the fact that most of the threats of violence made during the commission of this crime as well as one of the acts of battery were made by defendant Shimley, in which he persisted after his arrest, undoubtedly impressed the jury that his guilt was of a greater degree than that of his codefendants, hence, the difference in penalty. Certainly the ends of justice do not warrant us in interfering with the jury's verdict. To do so would be the arbitrary exercise of power. In Torgeson v. State, 45 Okla. Cr. 50, 281 P. 812, it was said:

"This court has repeatedly held that, where there was a conflict in the testimony, it would not disturb the verdict of the jury."

Also, we have repeatedly held that modification will be made only where it appears the sentence is excessive. Jones v. State, 84 Okla. Cr. 81, 179 P. 2d 484. Moreover, in the case of Kennedy v. State, 66 Okla. Cr. 318, 92 P. 2d 384, it was held that:

"The power of this court to modify judgment by reducing punishment in furtherance of justice, is not the power to commute by the Chief Executive, since judicial power to modify a judgment, and executive power to pardon are distinct; one being an award of justice, another being an act of grace."

Therein it was further said:

"Clemency is a matter of discretion and may be refused. Justice is imperative and must not be denied. In other words the Code of Criminal Procedure makes it the duty of this court to review the record, and in a proper case, in furtherance of justice, modify the judgment by reducing the sentence so as to prevent the imposition of punishment which the evidence will not warrant."

Citing in support thereof Harry v. State, 59 Okla. Cr. 302, 58 P. 2d 340. See, also, Hall v. State, 78 Okla. Cr. 389, 149 P. 2d 268.

Under the conditions herein presented, were we to modify this sentence to one year we would be compelled to hold that the jury acted from passion and prejudice, which this record does not support. Moreover, we would be invading the executive field by usurping the pardoning powers of the Chief Executive and his agency the Pardon and Parole Board. This we will not knowingly do.

At the time of oral argument counsel for the defendant urged that some of the jurors now favor reducing the sentence herein inflicted to one year as evidenced by their affidavit. This constitutes no part of the record which this court can properly consider. Such matters can only be presented to the Pardon and Parole Board. Such jurors, who signed the affidavit and who now feel that their verdict should be temporized by an act of grace, will find the doors of the Pardon and Parole Board open to them, where they may give full and free expression to their feelings, in the event they now feel impelled to compromise their verdict. This is a matter that is not for the consideration of this court. We would be acting in a most arbitrary manner and invading a field

which is not rightfully ours under the law, if we consider matters that are outside of the record. This we never do. Jackson v. State, 86 Okla. Cr. 6, 193 P. 2d 895, 898, wherein we said:

"Under the law we will consider only such matters as appear in the record of the trial below, reflected in the case-made."

See, also, Beatty v. State, 5 Okla. Cr. 105, 113 P. 237; Cochran v. State, 4 Okla. Cr. 390, 111 P. 978; Territory v. Cooper, 11 Okla. Cr. 699, 69 P. 813. For all of the foregoing reasons the judgment and sentence inflicted herein is accordingly affirmed.

BAREFOOT, P. J., and JONES., concur.