## JEROME BROWN v. STATE.

No. A-1936.    Opinion Filed May 15, 1915.

1.    COURTS—Terms of Court—Expiration. Where a general term of the court has been once regularly convened, on the day fixed by law, it can expire only by operation of law, or by an adjournment sine die, and will not so expire by operation of law until the first day of the next general term.

2.    APPEAL—Challenge to Juror—Prejudicial Error. Where there is nothing in the record to show that an incompetent, disqualified or otherwise objectionable juror was forced upon the defendant, this court will not consider assignments of error based upon rulings of the court on challenges for cause.

3.    TRIAL—Instructions. Where the instructions requested, so far as legal and pertinent, were fully and fairly covered by the instructions given, the instructions requested were rightly refused.

(Syllabus by the Court.)

*Appeal from District Court, Johnston County;*
*Robt. M. Rainey, Judge.*

Jerome Brown, convicted of manslaughter in the first degree, appeals. Affirmed.

*Cornelius Hardy,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for the State.

DOYLE, P. J. On information filed in the district court of Johnston county, charging him with the murder of Richmond

Tyubby, the plaintiff in error, Jerome Brown, was tried and found guilty of manslaughter in the first degree. The jury failed to agree on the punishment. On the 4th day of October, 1912, the court rendered judgment and sentenced the defendant to imprisonment in the penitentiary for the term of ten years. From this judgment an appeal was taken by filing in this court on March 14, 1913, a petition in error with case-made.

From the record it appears that the first trial of this information, in October, 1911, resulted in a mistrial; the jury having failed to agree. It appears that all the parties concerned were Indians; that on the day of the homicide the defendant and the deceased and Edmondson Porter were at the home of the deceased and from there went together in a buggy to the near-by town of Ravia; that early in the evening they left Ravia and went to Troy and from there to the home of the deceased. They were drinking whisky together that day in the town of Ravia and were all somewhat intoxicated when they arrived at the home of the deceased that evening. Shortly after they returned the defendant shot the deceased twice with a pistol. One ball entered the face and the other entered the groin. Tyubby died the next day.

J. C. Sleuts testified that he was sinking a shaft about two hundred yards from Tyubby's house and could see the house from where he was working; that these parties stopped and stayed about fifteen or twenty minutes with him that evening; that just before they got to the house the defendant fired a pistol and he saw them pass something from one to the other, and then another shot was fired and they went into the house; that he next saw Tyubby and his wife coming towards him on the run; that Tyubby stopped and his wife and two children went on down the hollow; that Tyubby did not have a weapon of any kind. In about five minutes Tyubby went back to the house; that witness watched him and saw him step up on the porch and in less than a minute he heard a shot and saw him fall. The man that fired the shot was close to the corner of the porch; then another shot was fired; that he did not go up there that evening.

Edmondson Porter testified that when they returned that evening the home folks were there, Lila, Betsey, and Sarah Hawkins, Ethel Sealey, Johnston Jimmy, Ester Sealey, and two small children, but most of the women left right away; that he was about two steps from Richmond when the defendant shot him. He heard Ester Sealey say, "Don't shoot him"; that Richmond was just standing there and when the defendant fired the first shot he fell forward; that the defendant stepped towards him and Ester Sealey caught his hand, but he fired the second shot and then went off with the pistol.

Ester Sealey testified that she was a sister of the deceased and was present when the shooting occurred; that when she heard the gun fire she looked around and saw the defendant with a pistol in his hand; that he went to where the body was lying and fired again; that about that time she got to where he was and took hold of his hand that held the pistol; that he told her to let loose and she did so.

The defendant testified as to the circumstances of the shooting as follows:

"Q. After you put up the team then what did you do? A. We went to the house—we met Richmond about half way of the yard, coming out. Q. Did you have any talk with Richmond there at that time? A. Yes, sir; he said the women folks was gone and I said that was too bad the way he had treated his folks and Richmond said he didn't give a damn and I said I did not either, it was not none of my folks and as I started to walk on by he kick me and I turned around and hit him. Q. What with? A. My fist. Q. Then what occurred? A. We started onto the porch and right at the porch Edmondson told us not to do that. He said 'Don't fight, boys.' And he grabbed Richmond and Richmond run up and hit me in my back. Q. Then what happened? A. I turned around and struck him and Edmondson grabbed Richmond and carried him into the room —they both went in there. Q. What room? A. In the south side. Q. How long did they stay in there? A. They were in there when I walked in the side room—they may have been in there ten minutes. Q. Then what did you do after they went into the side room? A. Then I walked in the side room and sat down on the bed and I listened and I heard somebody walk out and go around the house on the porch and I sat there a

while and studied and I thinks while they are gone I will take my gun and go. My grip was sitting under the bed and I pulled it out and unlocked it and took out my pistol and as I walked out Richmond met me in the door. Q. What happened then? A. He asked me where I was going and I told him I was going around the house and he said 'you come back' and I said 'I will be back directly,' and he said 'you god damn son of a ——, you come back,' and he walked up and got hold of my arm. Q. What else—what hand? A. My right. Q. Then what happened? A. He said 'I am going to kill you,' and I told him please to not do it and he said 'there is a hundred dollar reward on you.' Q. Then what happened? A. He drew his gun on me. Q. Then what? A. I threw up my left hand and the gun went off over my head. Q. What else, go on? A. He pushed me against the wall and stepped back and started to shoot me again and his gun snapped. Q. What did you do, if anything? A. By that time I got mine out—I had it in my hip here—and the third time he made a move I got mine out and shot him. Q. What happened then? A. Why, I shot him and when he was falling I shot him again. Q. After he fell what did you do? A. After he falled I seen he was not able to shoot me again and I turned around and walked off. Q. Where did you go? A. To Julia Brown's. Q. Now, Jerome, why did you kill Richmond? A. Self-defense, he was trying to kill me."

He further testified that Ester Sealey came to his bed room on the morning of the day of the killing and told him he ought to be dead and in his grave; that the deceased had told her to hold him there until he and Edmondson Porter could go to Ravia and get some whisky and that they would get him drunk and kill him, and that she and Edmondson would swear that he was trying to kill, and he would then get out of killing the defendant. He also produced a letter which he testified he received through the mail September 20th at Woodville, in part as follows:

"If you come back to Troy you will not go back alive Because me and my Brother is agoing to have you Killed and Rich-mon Edmon ready for you when you come back to Troy you can have your coffin ready when you come we dare you to come * * * we are going to have you cilled if we have to poison you ourself well you can call yourself a dead man this is the last When you do come you are gone to hell that all (Signed) East Seely."

—That the deceased was a half brother of Ester Sealey. He also testified that the deceased had told him that he wanted him to go back and live with Ester Sealey, and if he did not he would kill him.

Several witnesses testified that they had heard the deceased threaten to kill the defendant.

The testimony for the defense tended to show a conspiracy between Richmond Tyubby, the deceased, and Ester Sealey, his half sister, and their cousin, Edmondson Porter, to compel the defendant to marry Ester Sealey after having lived in adultery with her, or kill him.

Approximately 30 witnesses testified, but we deem it unnecessary, however, to further rehearse the testimony, as the foregoing statement is sufficient for the purpose of this opinion.

The assignments of error question the jurisdiction of the court and refer to the overruling of a challenge to the panel and a challenge to a juror, and the rulings of the court in the admission and exclusion of testimony, and exceptions to the giving and refusing to give certain instructions.

On September 9, 1912, when the case was called for trial, counsel for the defendant filed objections to the jurisdiction of the court,

"for the following reasons: 1st. That this is not a time when a regular term of this court is required to be held by law. 2nd. That the June term of this court expired by operation of law upon the convening of this court at another place in the district. 3rd. That a term of this court as required by law has been held at Atoka, Atoka county, and at Coalgate, Coal county, subsequent to the convening of the June term at Tishomingo. 4th. That no order adjourning the June term to reconvene September 9th, was made and entered of record in the journal."

These objections were wholly without merit. Chapter 102, Sess. Laws 1910, fixes the time of convening the regular term of court in Johnston county on the first Monday in January, June, and October.

The record shows that the district court of Johnston county convened June 3, 1912, and thereafter on June 29, 1912, adjourned to September 9th, and on the latter date convened pursuant to

adjournment. In the meantime terms of court were held at Atoka and at Coalgate in the same judicial district.

In *Tucker v. State,* 10 Okla. Cr. 565, 139 Pac. 998, it is said:

"The rule is too well settled to admit of controversy that, where a general term of court has been once regularly convened, on the day fixed by law, it can expire only by adjournment *sine die,* or by operation of law, and, unless adjourned *sine die,* will not so expire by operation of law until the first day of the next general term. *St. Louis & S. F. R. Co. v. James,* 36 Okla. 196, 128 Pac. 279. The trend of the courts is to so construe the law, if possible, as to uphold the sessions of courts actually doing business.".

The objections interposed to the jurisdiction were very properly overruled.

The defendant filed a challenge to the panel, for the reason that the regular panel of jurors summoned in June had not served two weeks as required by law and no order of the court was made and entered of record excusing said jurors for good and sufficient cause. The overruling of the challenge is assigned as error. The challenge is without merit and was very properly overruled. The overruling of a challenge for cause to a juror who stated that he did not believe in the death penalty is assigned as error. We do not find anything in the record showing who the juror was, or whether he served on the jury or whether the defendant was deprived of his right to peremptorily challenge him by reason of having exhausted his peremptory challenges, nor do we find that the ruling of the court on the challenge was a ground in the motion for a new trial.

Where there is nothing in the record to show that an incompetent, disqualified, or otherwise objectionable juror was forced upon the defendant, this court will not consider assignments of error based upon the rulings of the court upon a challenge for cause. *Colbert v. State,* 4 Okla. Cr. 500, 113 Pac. 558.

We have examined the exceptions taken to the rulings of the court on the admission and exclusion of testimony, and we

are satisfied that no error was committed prejudicial to the substantial rights of the defendant.

In the defendant's brief, alleged errors in the instructions given are discussed at great length. An examination of the record discloses that no exception was taken to any instruction given by the court. The record does not even show that a general exception was taken to the instructions given. The record shows the refusal of the court to give five instructions requested by the defendant and that said instructions were refused because covered by the instructions given. The instructions of the court were commendably correct and fully and fairly presented the law of the case to the jury.

After a careful examination of the evidence we are convinced that the defendant was convicted of the lowest grade of homicide that the law and the evidence will warrant. The defendant was the principal witness in his own behalf, and his version of the tragedy, which upon its face was extremely improbable, was, as we think, properly discredited by the jury.

We have considered all the questions urged by counsel and we find no reversible error in the record. The defendant had a fair and impartial trial. It follows that the judgment must be, and the same is hereby, affirmed.

FURMAN and ARMSTRONG, JJ., concur.