## J. W. PHILLIPS v. STATE.

No. A-4361.   Opinion Filed April 29, 1924.
Rehearing Denied June 12, 1924.
(225 Pac. 180.)

(Syllabus.)

1. **Courts—District Court—Adjournment of Term in One County over Intervening Term in Another.** Where the times for the commencement of terms of court are fixed by an act of the Legislature, but not the duration of time of ending the terms, a district court may adjourn a term in one county of the district over an intervening term in another county of the district.

2. **Homicide—Evidence Sustaining Conviction for Murder, but not Death Penalty.** In a prosecution for murder, evidence held sufficient to warrant a verdict convicting the defendant of murder, but insufficient to warrant the extreme penalty of the law, and the judgment and sentence is modified from death to imprisonment at hard labor for life.

Appeal from District Court, Atoka County; J. H. Linebaugh, Judge.

J. W. Phillips was convicted of murder, and he appeals. Modified and affirmed.

See, also, 20 Okla. Cr. 76, 201 Pac. 392.

Cornelius Hardy, Brown, Williams & Brown, J. G. Ralls, and P. B. H. Shearer, for plaintiff in error.

George F. Short, Atty. Gen., and John Barry, Asst. Atty. Gen., for the State.

DOYLE, J.   The information in this case, filed in the district court of Johnston county, charged appellant, J. W. Phillips, and Alex Watson jointly with the murder of J. M. Williams, alleged to have been committed in said county on August 3, 1921.   A change of venue to Atoka county was granted.   Upon his separate trial appellant was found guilty of murder, and his punishment was fixed by the jury at death.   He has appealed from the judgment of conviction and sentence of death to this court.

From the evidence it appears that the building occupied by Casey's Drug Store is situated on the corner of Main street and Kemp avenue, Tishomingo, and fronts north, with a corner entrance to the drug store.

J. M. Williams, deceased, commonly known as Marion Williams, had been sheriff of the county for three consecutive terms, and for several years very bitter feelings existed between him and appellant, arising out of appellant's opposition to Williams in one of his campaigns for sheriff.

Appellant was engaged in the produce business and occupied a storeroom facing Kemp avenue, about 100 feet from the rear entrance to Casey's Drug Store. The testimony of at least 10 eyewitnesses shows that about 10 o'clock in the forenoon of the date alleged appellant and his codefendant, Alex Watson, a deputy sheriff, were in Casey's Drug Store; that Marion Williams drove up and parked his car in the middle of Main street in front of Casey's Drug Store, and got out of his car and walked to the entrance of Casey's Drug Store; that he took hold of the screen door and opened it about half way, when three shots were fired from within the drug store; that he turned and started to cross Main street, angling south from his car; that appellant stepped out of the drug store with a gun in his hand, took 6 or 7 steps following him, stopped and holding his pistol with both hands took aim and shot him in the back. Williams fell on the street and died within 10 minutes. He was unarmed, and no weapon was found in his car.

W. A. Miller, as a witness on behalf of the state, testified:

"I saw Mr. Williams park his car on Main street. He got out and walked over towards the drug store. As he stepped upon the sidewalk he spoke to some parties and walked on. As he took hold of the screen door I heard a

shot fired, almost instantly a second shot. As Mr. Williams turned a third shot was fired. When he was probably twenty feet from the door Phillips came out of the drug store, followed him 6 or 7 steps, and shot him in the back.''

Joe Diggs testified:

''I saw Mr. Williams just as he came on the sidewalk. He was in his shirt sleeves. As he opened the screen door of the drug store I heard three shots. He turned and humped up, and as he walked across the curbing Phillips came out of the drug store with a six-shooter in his hand and shot him in the back. I went to Mr. Williams. He was not armed. We found two nickels and a dime in one pocket and a watch in his watch pocket.''

W. N. Miller testified:

''I heard the shots, and saw Mr. Williams coming from the door of the drug store. He was about half bent, and as I walked up to him Phillips stepped out on the sidewalk and raised a large pistol with both hands and shot him in the back. Mr. Williams fell. As I took hold of him, he said, 'Uncle Bill, they have killed me.' ''

John Reubin testified:

''I was city marshal. I was crossing Main street, and I saw the last shot fired. Mr. Williams was going east. Phillips stepped out of the drug store and leveled down with a pistol in both hands and shot him in the back. Phillips broke his gun, and handed it to Alex Watson. Then they went back into the drug store.''

The testimony of Dr. J. T. Looney, who appeared upon the scene as the last shot was fired, shows that one bullet entered about one inch below the right shoulder blade and came out four and one-half inches below the right nipple; another bullet entered below the right nipple; another entered three inches below the left nipple and another entered two inches below the point of the breast bone.

T. R. Gibson, sheriff, testified that in a conversation with appellant on the day of the killing he said:

"Mr. Williams was opening the door with his left hand and was fumbling around his waist with his right hand. I thought he was making preparations to get a gun and I had to shoot him."

He further stated:

"I put three shots that your hand could cover in front here."

He repeated this statement four or five times, and I said:

"Mr. Phillips, you say you had to kill Marion Williams, what in the devil are you going to do with that last shot?"

And he said:

"I had been aggravated with Marion and scared that he was going to kill me, and I wanted to know that I was not going to be bothered with Marion Williams any longer."

As a witness in his own behalf appellant testified:

"I fell from a truck and skinned my knee that morning and when I went back to my store my daughter was there and said, 'Papa, for God's sake come on in here and stay in here, Mr. Williams has been here flushed up red faced as he could be, and seemed to be very angry,' and she said, 'Come on in the store.' I went in, put my gun on, and went to the drug store to get some medicine for my leg; I lacked a nickel of the price and went back to my store to get the nickel. When I returned Alex Watson was in there. I said, 'Sheriff, have a drink,' and we had drinks and some cigars together. I was watching up the street to see if my boy was coming up the street with the feed and bring my car down; as I turned Marion was coming in this door, with this mad, bulldog look. First I seen of him liked to scare me to death. He grabbed the door with his left hand. I whirled and tore my clothes open, grabbed my gun, and shot three times. He was standing at least one step inside the door. In an instant he whirled, and went out, I could not see him for

the smoke and scared to death. I stepped outside the door as quick as I could and my next thought was that he was going to his car to get that Winchester to kill me, and I thought it was the only thing to do to save my life, and I shot him again as he stepped off the sidewalk."

He further testified: That he had frequently seen Williams with a pistol, Winchester, and shotgun; that at the county fair Williams, who was then sheriff, charged him with selling intoxicants to an Indian and making him drunk. That in February prior to the killing Williams rode up in front of appellant's place of business with a big six-shooter and said to appellant, "What about that story you have been telling about me being interested in Lige Deacon's still," and, when appellant denied this, Williams stated with an oath that he would make appellant eat everything he had said about him. That later on in the same month of February Williams rode up the street in front of appellant's place of business on a horse with a Winchester on his saddle, and appellant had Doc Bates telephone for the officers. That about two weeks before the killing Williams, together with his brother, Bud, both drunk, drove up in front of appellant's place of business, and Williams said to appellant, "Do you feel lucky this morning? By God if you feel lucky let's go—we are rearing to go." That on the 28th day of July, 1921, Richard Lowery told appellant that Marion Williams had a conversation with him in which he stated that he wanted him to kill Phillips and offered him a car and $50 to buy the best gun he could buy and said that he would see that all court expenses were paid. That appellant reduced Lowery's statement to writing and showed it to the sheriff's force. That when Williams and Callen were rival candidates for sheriff appellant distributed circulars against Williams. A copy of this circular was offered in evidence and excluded by the court.

Louetta Phillips testified that about an hour before the killing Mr. Williams walked up to the door of her father's store and looked in and had his hand in his coat; that she asked him, "Is there something for you, Mr. Williams?" and he shook his head and walked away; that she told her father immediately on his return to the store.

Buck Blackwell testified that before the primary election he had a conversation with Williams in which Williams said that if he did not change his mind, he (Williams) and appellant Phillips could not both live in Tishomingo.

Alex Watson, codefendant, testified:

"I was in the drug store when Phillips came in, took a drink of coke with him and a cigar, talked with him about five minutes. He said, 'Well, I have got to go.' He went to the door, and I turned back towards the cigar case. I was not expecting anything. Just then it was, 'bing, bang, bluey.' I turned, and it looked like Williams took hold of the door. He was leaving, and Phillips went out. I looked to see if Williams had a gun. I saw he did not, and I went out and arrested Phillips."

Several witnesses testified that the deceased had made threats against appellant's life. There was some testimony tending to show that deceased was a violent, vindictive, quarrelsome man.

The state in rebuttal called and examined not less than 10 character witnesses, each of whom testified, over the objection of appellant, that they knew the reputation of J. M. Williams, deceased, in the community in which he lived as to being a peaceable law-abiding citizen, and it was good.

The first alleged error is in overruling appellant's objection to the jurisdiction of the court, interposed when the case was called for trial, "for the reason that no order of court has been made and entered of record for the holding

of an adjourned term of the January, 1922, term of the district court of Atoka county, to be held at this time,'' and ''for the reason that the January, 1922, term of the district court of Atoka county automatically expired by operation of law on the date provided by statute for the convening of the district court of the Twenty-Sixth judicial district in Coal county on the first Monday in March, 1922.''

The record shows that on the 20th day of March, 1922, the case was called for trial, and that the order directing the drawing of a jury, and all proceedings had at the trial, were during said month of March.

It is contended that the term of the district court in one county is terminated by operation of law upon the day for the beginning of another term in another county of the district, and for this reason the judgment appealed from is void.

The statute provides as follows:

''The time of convening the regular terms of the district court in each county in the several district court judicial districts of the state shall be on the first Monday in each of the respective months hereinafter set out in this section after each of the respective counties, to wit: * * *

''District No. 26. In Atoka county, in January and July; in Coal county in March and September; in Johnston county, in May and November.'' Comp. Stat. 1921, § 3072.

''The regular term of any district court may be adjourned from time to time, or sine die, by a resident judge of the district court or by any other district judge assigned and holding court in such district, but such adjournment shall be to a time prior to the convening of the next regular term. The regular judge, or any judge assigned, may make all orders with reference to the adjournment of the term.'' Section 3087, Comp. Stats. 1921.

The record shows that at the regular January term in Atoka county this cause was continued until March, and on February 16, 1922, this cause was set for March 20, 1922.

Counsel for appellant insist that under the statute fixing the time for the commencement of the term of court in one county, the law, by necessary implication, limits the duration of the term immediately preceding in another county of the district, and, unless sooner terminated by adjournment, the term will expire, by operation of law at that time. We are of the opinion that there is no merit in this contention.

Courts are not limited in their power of adjournment to an adjournment from one day to a succeeding day. They have the inherent power to adjourn to a more distant day, when not restrained by the Constitution or statute law; and there is no such restraint upon the district courts of this state.

The Constitution provides that:

"Two or more district judges may sit in any district separately at the same time." Const. art. 7, § 9.

The question here presented was before this court in the case of Brown v. State, 11 Okla. Cr. 498, 148 Pac. 181. We held that:

"Where a general term of the court has been once regularly convened, on the day fixed by law, it can expire only by operation of law, or by an adjournment sine die, and will not so expire by operation of law until the first day of the next general term."

In Tucker v. State, 10 Okla. Cr. 565, 139 Pac. 998, we said:

"The rule is too well settled to admit of controversy that, where a general term of court has been once regularly

convened, on the day fixed by law, it can expire only by adjournment sine die, or by operation of law, and, unless adjourned sine die, will not so expire by operation of law until the first day of the next general term."

And see St. Louis & S. F. R. Co. v. James, 36 Okla. 196, 128 Pac. 279. In S. W. Ins. Co. v. Douglas, 81 Okla. 232, 198 Pac. 334, the Supreme Court held:

"A district court legally opened for all general purposes continues in session until it adjourns sine die, or expires by law, and, when an adjournment is made subject to call, the term not having then expired by law, convenes, the court is legally constituted, and its acts are valid and binding."

In the case of In re McDonald, 4 Wyo. 150, 33 Pac. 18, the Supreme Court of Wyoming held that:

"In the absence of any statute prescribing the duration of a term of a district court, the length of its session, or when it may adjourn, such court may adjourn a term in one county of the district over any intervening term in another county."

In Re Hunter's Estate, 84 Iowa, 388, 51 N. W. 20, the Supreme Court of Iowa held that:

"A term of the district court may be adjourned for 16 days, even though during the interval the judge of said court holds a regular term of court in another county."

In the opinion it is said:

"Adjournments of the business of a term of court from day to day and from time to time, as the necessities of the situation seem to demand, is essential to the conduct of the business, and has the sanction of universal usage. Such a right is not questioned. Without the intervening term in Iowa county, the validity of the adjournment to February 17th would not, we suppose, be questioned. How does that fact affect the situation, or why should it render the judgment or order void? It is certainly without effect on the Johnson county term. Barring the fact that the same judge held the two terms, they are as entirely distinct and inde-

pendent as are terms held in different districts. The fact that the same judge holds the two terms is not of importance. It is the holding of distinct and separate terms, each unaffected by the other. There is nothing in public policy or private interest that demands a rule that such an adjournment is void.''

There is nothing in the statute above quoted fixing the time to be consumed in the sessions of any district court or date of its adjournment; and in the absence of some positive law to the contrary, a district court, being a court of general jurisdiction, has power to adjourn over an intervening term, or a portion of a term held in another county of the same district during the interval of adjournment.

It follows that the adjournment over the intervening term in Coal county was valid, and the proceedings unaffected by the adjournment.

Some exceptions were taken to the rulings of the court in the admission and rejection of evidence. We deem it sufficient to say that we are of the opinion that none of them were well taken.

The instructions given by the court submitted the issues of murder and manslaughter in the first degree and the law of self-defense.

Complaint is made that the instructions given improperly submitted the law of self-defense, in that they do not cover the law on the right of pursuit in self-defense, and error is assigned on the refusal to give a requested instruction as follows:

''If the defendant was attacked by the deceased, and the defendant, under the circumstances as they appeared to him at the time, in good faith believed that it was necessary to shoot the deceased to save his own life or to protect himself from great bodily harm, he had the right to do so, and

to continue shooting until he believed himself out of danger, and if, at the time he fired the last shot he believed that deceased was going to his automobile to secure a gun to return and renew the attack, the defendant had a right to fire the shot provided the defendant was justified in firing the first shot.''

As to the character of this homicide there can be no doubt. On the undisputed facts it was deliberate murder. According to his own statement on the witness stand, appellant is guilty of a cruel and cowardly assassination. While the necessity for taking human life need not be one arising out of real or actual or imminent danger in order to justify the slayer, as he may act upon the belief arising from appearances which gives him reasonable cause to apprehend danger of death or great bodily harm, although there may be no actual danger, and his guilt must depend upon the circumstances as they appeared to him, yet the danger must not be brought on by the wrongful conduct or unlawful acts of the slayer, and no person has the right to kill another through unfounded fear or cowardice. Reed v. State, 2 Okla. Cr. 589, 103 Pac. 1042.

To repel a simple assault, the person assaulted is not authorized to attack his assailant with a deadly weapon. He will not be justified in doing those acts that are calculated to destroy the life of his assailant, unless the assault is of such a character as to endanger his life or inflict on him great bodily injury, or to excite his fears as a reasonable man that such would be the result of the assault. If his assailant retreats in good faith, and he pursues and kills him with a deadly weapon, the killing cannot be justified on the ground of self-defense. The law limits him to such acts as are necessary or apparently necessary to self-defense. Gransden v. State, 12 Okla. Cr. 417, 158 Pac. 157. And in this case it was held that:

"Where the unimpeacheable physical facts squarely contradict the words of the defendant upon the witness stand, and show the theory of his testimony to be absurd, courts are not required to ignore such physical facts and give instructions not in harmony with them, but absolutely subversive of the theory they mutely and unalterably declare."

Taken as a whole, the instructions given covered every phase of the case, and were more favorable to the defendant than he had any legal right to demand. On the undisputed facts as shown by the evidence the requested instruction was properly refused.

We have given this case that careful study which its importance requires, and the most careful examination has revealed nothing in the record that gives us the right to say that the interests of justice require a new trial.

One of the grounds of the motion for a new trial and assigned as error is that the extreme penalty assessed by the jury in its verdict is excessive. It is urged that the jury abused its discretion in assessing the death penalty, and that the judgment and sentence should be modified to imprisonment for life. Counsel for the state announced that they do not oppose such modification.

In a capital case, the law of our state in its great humanity allows the jury, after they have first determined the question of guilt, to assess the punishment, which may be death or imprisonment for life at their discretion (section 1739, Comp. Stats. 1921) and, even after the jury say that the defendant should suffer death, this court, in furtherance of justice, has the power to modify the judgment to imprisonment for life at hard labor (section 2820, Comp. Stats. 1921). Fritz v. State, 8 Okla. Cr. 342, 128 Pac. 170; Owen v. State, 13 Okla. Cr. 195, 163 Pac. 548; Westbrook v. State,

14 Okla. Cr. 423, 172 Pac. 464; Chambers v. State, 16 Okla. Cr. 238, 182 Pac. 714; Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613.

No more solemn duty can be imposed upon the courts than the duty of protecting, and the duty of taking human life. To take the life of a human being is an awful thing, even when it is taken by the law.

Carefully considering the whole testimony in the case, we feel constrained to say that we find but few palliating circumstances in behalf of appellant. However, it appears that each had often threatened to kill or injure the other, that their animosity and enmity arose out of campaign canards, and that the deceased had often been overbearing and domineering in his conduct toward appellant. In this respect it differs from murder committed in the perpetration of a felony.

For the reasons stated, we are of opinion that the punishment imposed is excessive, and that justice requires a modification of the judgment and sentence of death to that of imprisonment at hard labor in the state penitentiary for life. As thus modified, the judgment herein is affirmed.

MATSON, P. J., and BESSEY, J., concur.