# RICHARD JOHNSON et al. v. STATE.

No. A-9660.   Sept. 25, 1940.
(106 P. 2d 149.)

Ward, Justus & Ward, of Tulsa, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DOYLE, P. J. This is an appeal from the district court of Tulsa county wherein Richard Johnson and Noah Laverne Tucker were jointly tried and found guilty of robbery with firearms, and were each sentenced to imprisonment at hard labor in the penitentiary at McAlester for a term of 25 years. The judgments and sentences were rendered and entered on the 28th day of November, 1938. An appeal was perfected by filing in this court on May 25, 1939, their petition in error with case-made attached.

The indictment in this case, returned, presented and filed in the district court of Tulsa county, October 6, 1938, charged in substance that in Tulsa county, on the 21st day of September, 1938, Richard Johnson, Noah Laverne Tucker, and Tom Hollis did there and then unlawfully, willfully, forcibly, conjointly and feloniously, while acting in concert, each with the others, take from the person of one Earl Stanley, and against his will, personal property, to wit: $4.50, in good and lawful money, by there and then threatening to shoot the said Earl Stanley with a pistol, thereby producing in the mind of said Earl Stanley fear of immediate and unlawful injury to his person, and said fear so produced was sufficient to and did overcome all resistance on the part of him, the said Earl Stanley.

Among other assignments of error it is contended that the evidence is insufficient as to each of said defendants to sustain the conviction.

The testimony in the case was substantially as follows:

Earl Stanley testified that he was employed as a taxi driver for the Cloverleaf Cab Company, and was driving a black Studebaker sedan; on each back door and across the back of the cab was the word "Cloverleaf." That on the night of September 21st he had this cab parked at the Union Bus Station, in the city of Tulsa. Around 11:30 that night he saw three men getting in his cab. He identified both defendants as two of the boys. They told him to drive to 1306 North Wheeling. The defendant Hollis, not on trial, told him where to drive. At Marshall Place in Wheeling, one of the men in the back seat stuck a gun in his side and told him to stop the car. The one who held the gun on him was not on trial. This little fellow (indicating Tucker) got under the wheel and drove out in the woods about three miles, and they took $4.65 from him and took his car. The next time he saw the car was the following evening at Seminole; the signs were painted out and the governor had been removed from the car. The car was in the possession of Jake Sims, chief of police; that it was in Tulsa county where they took his money.

Carl Johnson testified that he is a taxi driver for the Cloverleaf Taxi Company; was near the Union Bus Station and saw three men get into Earl Stanley's cab; he pointed out the two defendants on trial as being two of the boys; that he first observed these three men 15 or 20 minutes before they got into Stanley's cab; they were coming east from the city hall and walked in single file across the driveway to the bus station, and the man whom he identifies as Hollis was in the lead; none of them said anything to him.

Amos Mizell testified that on the night of September 21st, while on his way from Tahlequah to his home in

Cushing, his automobile broke down about two miles west of Broken Arrow, and over the objections and exceptions of the defendants he was permitted to testify that while he was asleep in his car, an automobile drove up and three fellows got out of the car; one of them put a gun in his ribs and asked if he had any money. He told him no, but he searched him and took all the money he had, about $22, that these men drove up in a black new Studebaker, a Cloverleaf cab; that while one of them was taking his money another was pushing an ice pick in the tires of his car, letting the air out, and one of them took the license plates off his car and put them in the cab. He identified defendants on trial; that the next day after the defendants were apprehended he was called up and the license plates were in the Cloverleaf taxi that stopped there that night.

Helen Elliott testified that she was a resident of Seminole, was 17 years of age, had known the defendants, Johnson and Tucker, three or four months; that she saw the defendants on the 22nd day of September, the same day they were arrested at Seminole. They came to her house about 8 o'clock that morning, in a black Sedan car. Tom Hollis asked her to go with them. She got in the car and rode to a fruit stand with them, where they picked up two girls and rode around with them. Over the objections of the defendants she further testified that she asked these boys where they got the car, and one of them said in Old Mexico; Tucker had on a wrist watch and Hollis told her he got it off a taxi driver, and they left; that within ten minutes Chief of Police Sims came to her house after her, and she saw the defendants on trial at the jail.

On cross-examination she testified that the only one of the defendants she actually knew was Tucker; she then said she did know Tom Hollis; that she met him at her home a long time ago; that she knew at the time she rode

with them that they were going to get her into trouble; that on a previous occasion they had taken her out of the state of Oklahoma.

Jake Sims testified that he arrested the defendants on information that they were in possession of a stolen car; the defendants were arrested at a beer joint in Seminole, near where the car was parked. Tom Hollis was out behind at the outside toilet; he got away but was later captured. The defendant Johnson told him that the automobile belonged to his mother; this car was later identified as belonging to Earl Stanley; the car and the two defendants were turned over to Mr. Hughes, chief of detectives of the Tulsa police department, and two other men on his staff.

Don McGuire testified that, as a member of the Tulsa police department, he went to Seminole on September 22nd, for the purpose of bringing the defendants, Johnson and Tucker, back to Tulsa, that Chief Hughes and Lieutenant Altaffer went with him; that the following conversation was had with the defendants on the way back to Tulsa:

"I asked them about various hijackings, and the man that was with them, and the car, asked them about this car, Studebaker sedan, Cloverleaf Cab, and how they had painted the signs on the doors, and where they had got the tags that they put on the Studebaker sedan; and I asked them about a Chrysler sedan that had been taken previous and was abandoned in Bristow, in or near Bristow; and we talked to them about their trip through the country with the girl, and the only thing—well, they never did admit that Hollis was with them at that time; that is about the only thing they didn't admit to us on the way back to Tulsa. Q. What did they say about the Studebaker sedan, the Cloverleaf cab? A. They said it was a pretty fast automobile and rode pretty good, but not as good as a Chrysler sedan. Q. Did they tell you

where they got it? Mr. Justus: Object to that as leading. The Court: It is leading. Q. Go ahead and tell the rest of the conversation. A. They told us where they had gotten both of the cars. Q. That is what I want to know, just what they told you. A. We asked them if they had taken it from the cab driver, and they told us that they had, and we asked them about taking this Chrysler sedan from a Mr. Wickson; of course they didn't know Mr. Wickson's name, but about taking this Chrysler sedan on Riverside Drive, close to the river, from a man and also asked them about a bus that was hijacked on Forty-First street, I believe, and South Peoria. Q. I want to know just what they said. A. They admitted these armed robberies to us at that time, on the way back to Tulsa."

Tom Hollis, codefendant called as a witness by the state, testified:

"Mr. McDonald: Q. Do you know the defendants, Richard Johnson and Jack Tucker? A. No, sir, I have seen them while I was up in jail, and I seen them once outside. By the Court: You mean you don't know them? A. No, sir, I know them since I have been in, I have been in 38 days. Mr. McDonald: I would like to have the jury excused."

Whereupon the jury retired in charge of the bailiff from the courtroom.

Witness handed a written instrument.

"Q. Is that your signature? A. Yes, sir. Q. Did you make this statement? 'My name is Tom Hollis, I am 26 years old and live at 1302 North Trenton?' A. Yes, sir. If I made the statement I didn't know these boys at all. I thought that might have been their names. The Court: Q. Do you know these boys? A. I seen them in jail is all. Q. Do you know these two boys? A. No, sir, not personally. Q. Were you ever associated with them? A. No, sir. Q. Is that statement true, that you have made here? A. Well, the names of these boys, down at the city they told me they had signed a statement, and of course I don't know the other boys' names, I thought that was the boys' names. Q. Tell the real truth now, do you know them? A. No, sir. Q. You were not with them at any time? A.

At any time, but once I seen them in Seminole. Q. This is a serious matter with you, and here is a statement that the court has been advised that you signed, and I am going to ask some questions, and I want you to consider it. You say you don't know these two boys? A. Not personally. Q. Well, do you know them anyway? A. Just met them while I have been upstairs 38 days, I have been in jail 38 days. Q. You didn't associate with them on this night of this trouble? A. No, sir. Q. I don't want to see you get in any more trouble; I understand you pleaded guilty to this charge? Mr. McDonald: We refuse to accept this plea, he has not been sentenced yet."

Whereupon the jury returned to the jury box.

"Cross-examination: Q. You are one of the defendants in this case, are you not, Mr. Hollis? A. Yes, sir. Q. I will ask you whether or not you in company with either of the two other defendants robbed Mr. Stanley of the taxicab on the 22nd day of September, or at any other time? Objection sustained. Q. Were you with these defendants? Object to that as improper cross-examination. Sustained. Q. I will ask you whether or not these defendants were present at the time you robbed Mr. Stanley of the taxicab? Same objection. The Court: Well, it is improper cross-examination, but I am going to let him answer it. A. No, sir."

The state rested. Thereupon counsel for the defendants moved the court to advise the jury to acquit the defendants and requested the court to give the following instruction:

"Style and number of the case. Gentlemen of the jury, you are advised by the court to acquit the defendants and say by your verdict, 'not guilty.' The Court: It is denied. Exceptions allowed."

There was no evidence offered on the part of the defendants. The contention urged is that the evidence is insufficient to connect appellants with the robbery.

While it is the province of the court to pass upon the competency of witnesses, it is altogether for the jury, as

exclusive judges of the facts to say what degree of weight or credibility shall be given to their testimony.

In this court the presumption does not obtain that the appellant is innocent of the crime. On the contrary, the presumption is that he is guilty where a conviction has resulted in the trial court. The presumption also is that such conviction is based upon competent, sufficient, and credible evidence, and the burden rests upon the defendant in the appellate court to establish the contrary.

In our opinion the facts and circumstances as shown by the foregoing abstract of the uncontroverted evidence on the part of the state establishes the guilt of the defendants beyond any reasonable doubt.

It is next contended that the court erred in admitting incompetent, irrelevant, immaterial and prejudicial testimony on the part of the state.

In their brief counsel say:

"The defendants next urge for a reversal of the case that the court erred in admitting incompetent, irrelevant, immaterial and prejudicial evidence on the part of the state, over the objection and exception of the defendant.

"The contention of the defendants here is that the court permitted the witnesses Amos Mizell, Hellen Elliott, Jake Sims, and Don McGuire to testify against the defendants concerning other offenses than the one for which they were on trial."

Counsel cite and quote from a number of decisions in support of their contention. The facts in this case, however, distinguish it from those cases in which the admission of evidence as to other offenses has been held to have constituted reversible error.

The robbery of Mizell was closely related to that of Stanley. The robbery of Stanley occurred about 11:30; Mizell was robbed an hour later, about two miles out of Broken Arrow, on the road to Tulsa. The robber's car

came from the direction of Tulsa. The witness Mizell positively identified the defendants as two of the robbers; they were in possession of this Cloverleaf cab, and in company with Tom Hollis. This proof of the possession by the defendants of the stolen automobile was clearly competent and relevant. Chesser v. State, 63 Okla. Cr. 84, 73 P. 2d 191.

It may be regarded as settled that where the offense charged is so connected with the other offenses sought to be proved as to form a part of an entire transaction, evidence of the latter may be given to show the character of the former.

In the case of Koontz v. State, 10 Okla. Cr. 553, 139 P. 842, 844, Ann. Cas. 1916A, 689, this court said:

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish a common scheme or plan, embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or to connect the defendant with the commission of the crime charged."

In the case of Johnson v. State, 35 Okla. Cr. 212, 249 P. 971, 972, this court said:

"It is, of course, fundamental that when a defendant is upon trial for an offense he is to be convicted, if at all, for the particular offense charged, and evidence of other offenses is not admissible for the purpose of showing him guilty of the particular offense for which he is on trial. There are, however, several well-settled exceptions. Evidence that tends directly to prove a defendant guilty of the offense for which he is on trial or that tends to prove some element of the offense charged or to show guilty knowledge, intent, motive, or is so closely linked or connected with the crime charged as to throw light upon it, is admissible, although such evidence may tend to show the commission of some separate offense and does in a measure apparently work injury to the accused. Tudor v. State, 14 Okla. Cr. 67, 167 P. 341; Cross v. State, 11

Okla. Cr. 117, 143 P. 202; State v. Rule, 11 Okla. Cr. 237, 144 P. 807."

And see Spivey v. State, 69 Okla. Cr. 397, 104 P. 2d 263.

In Cross v. State, 11 Okla. Cr. 117, 143 P. 202, it is said:

"Evidence is admissible, in the trial of a criminal cause, which tends directly to prove the guilt of the accused, although it may also show, or tend to show, the commission of a separate and distinct felony, and this is true although the admission of such testimony may arouse resentment in the minds of the jury and result in a greater punishment than would ordinarily be inflicted."

It is well settled that evidence covering the commission of another offense is always admissible when two crimes are so linked together in point of time or circumstances that one cannot be fully shown without proving the other.

It follows from the foregoing review that the court did not err in overruling the objections interposed to the testimony of the witness Mizell.

The testimony of the witness Helen Elliott complained of, it appears, was brought out on cross-examination and was given in response to questions by counsel for the defendants. It related to other purported offense, and was incompetent, irrelevant and prejudicial to the defendants. However, it was invited error of which they have no right to complain.

The testimony of the witness Sims was clearly competent and admissible.

It also appears from the record that no objections were interposed and no exceptions taken to the testimony of the witness McGuire as to defendants' admission with reference to other offenses.

As a general rule, an assignment that the trial court erred in admitting certain testimony will not be considered

where no objection was made or exception taken to the admission of the same.

Finally, it is insisted that the punishment imposed was excessive; that the verdicts fixing the punishment were the result of passion and prejudice on the part of the jury.

It appears that another indictment was returned on the same day as the indictment in this case, charging robbery of Amos Mizell. In that case, tried three days later, the jury found these two defendants guilty, leaving the punishment to be assessed by the court, and these defendants received an additional sentence of ten years, to run consecutively in the latter case.

Counsel in their brief say:

"We respectfully urge that after taking all the facts into consideration, that the punishment in these two cases was excessive. These defendants were young men, just mere boys, and a sentence of 35 years in the penitentiary means that they will be compelled to spend the greater portion of their lives in that institution, and in the event this court should fail to agree in this case with the contentions of the defendants upon which they rely for reversal, we think justice requires a modification of the severe punishment dealt out to these two young men, especially when the records in both cases are considered together, and we hope this court will take into consideration the youth of these defendants, and in the event this conviction is upheld, order and direct a modification of the judgments and sentence of the court so that the defendants within a few years will be given an opportunity to become useful, law-abiding citizens."

It also appears that the parents of both the defendants are residents of the state; that the defendant Johnson is a married man; that the defendant Tucker is a married man and father of a baby child.

The first judgment pronounced by the court recites:

"that the said Richard Johnson, who upon his oath in open court states his age to be 21 years."

The second judgment recites: "that the said Noah Laverne Tucker, who upon his oath in open court states his age to be 20 years."

It is both the spirit and intention of the law that punishment shall be imposed in criminal cases for the protection of society and the reformation of the criminal, and sentences should be imposed in keeping with the spirit of the law. After a careful consideration of the whole case, our conclusion is that the punishment assessed by the jury is excessive, and we cannot say that the jury was not influenced by passion and prejudice engendered by the admission of incompetent testimony to which no exceptions were taken. Wherefore the court is of the opinion that the ends of justice require a modification of the judgment and sentence of each defendant from the term of 25 years to a term of five years' imprisonment in the state penitentiary at McAlester. As thus modified, the judgments of conviction appealed from are affirmed.

BAREFOOT and JONES, JJ., concur.