## MABEL BROWN v. STATE.

No. A-10559. June 5, 1946.

(169 P. 2d 772.)

W. A. Lackey, of McAlester, and M. O. Counts, of Hartshorne, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Paul Gotcher, County Atty., of McAlester, for defendant in error.

BAREFOOT, J.  Defendant, Mabel Brown, was charged in the district court of Pittsburg county with the crime of murder; was tried, convicted of manslaugh-

ter in the first degree, and her punishment assessed at four years in the State Penitentiary. From this judgment and sentence she has appealed.

The facts in this case are that defendant Mabel Brown, killed L. C. Funderburk on October 25, 1941, by stabbing her with a pocket knife. Both parties were negro women. Defendant's husband was named Mitchell Brown. There was some evidence that L. C. Funderburk had been keeping company with the husband of defendant at different times. On the night of the killing, defendant had gone from her home in McAlester to a nearby barbecue stand. She was accompanied by another woman, and a small child. After purchasing some sandwiches, she started to her home. She met L. C. Funderburk, as she expressed it, "about dusky dark." It was between 5 and 6 o'clock in the evening.

A number of eyewitnesses testified in behalf of the state. One of them testified that he saw the defendant leaving the barbecue stand, and that he heard her make the statement: " 'This news packing is going to be cut out.' That she was going to stop it." That soon after this statement was made, witness saw L. C. Funderburk coming down the street, and she cried out, "She stabbed me." She was bleeding, and asked witness to get her mother, which he did.

Another witness testified that he was operating a barbershop in close proximity to where the killing occurred. That he was sitting in his door and saw defendant pass on the sidewalk between 5 and 5:45 in the evening. That he saw L. C. Funderburk coming down the sidewalk, and that he knew them both and saw them meet. His testimony was:

"Q. When they met, what happened? A. When they met this woman here says, 'L.C.' she says, 'Why do you dip into my business?' Something like that. Q. Mabel Brown said that? A. Yes, and all in a minute this girl says, 'My throat is cut—I been stabbed—I been stabbed to death!' Q. That was L. C. said that? A. Yes. Q. Did L. C. make any move of any kind? A. I didn't see any. She didn't have a chance. Q. Did you see Mabel Brown make any move? A. I saw Mabel Brown—after this girl hollowed 'I am stabbed' keep on her direction. Q. Had you seen Mabel Brown make any move with her hands? A. No, sir. Q. It all happened at once? A. All in a minute. Q. What did L. C. Funderburk do? A. She ran—come this way—and fell. Q. Where did she fall? A. Si House's porch. Q. What did Mabel Brown do? A. I don't know. She went out in the middle of the street and stopped. Q. What street was that? A. Grand. Q. Grand avenue? A. Yes, sir. Q. Was there anyone with Mabel Brown? A. There was a little girl. I didn't know who she was. I didn't recognize her. Q. When they passed the door? A. Yes."

The night chief of police of McAlester, Ernest Ambrose, testified as to the location of the killing and certain nearby objects. He was called and arrested defendant the night of the killing. He testified:

"Q. Did you have any conversation when you took her in charge? A. She came to the back door of Mr. Hardeman's home and met me and I said, 'Well, Mabel, you killed her. She said, 'She made me.' I said, 'Where is your knife?' And she said, 'Here it is, Mr. Ambrose'; and she gave me a knife, one of those like colored folks carry, single blade. Q. You indicated on your fingers— how long the blade was? A. I would say three and a half inches."

Defendant's testimony as to the killing was as follows:

"Q. You tell the jury in your own way just exactly what happened, what she said, what you said, what she did and what you did, as best you can. A. Well, she said, 'Mabel,' I said 'yes', she say 'its true what these niggers are running around here saying I am going with Mitchell.' And, 'Its true, I am going with him', and said 'What are you going to do about it?' I said, 'Not anything I can do about it', and she said, 'Oh yes, I am tellin' you.' I said, 'Well, I haven't never seen you.' I said, 'If I ever catch you I'll let you know what I am going to do about it.' And she said, 'You must remember he separated me and my husband—' Q. What did you tell her in answer to that? A. I said, 'No, don't say that, because he couldn't go with you unless you let him—he is not to blame for that.' Q. All right, did she have anything in her hand at that time? A. She did, she had a white-handled knife and she was trembling and talking to me. Q. (handing witness an exhibit) Is that the knife? A. Yes, its just like that knife. Q. She was holding it in her hands? A. Yes, she sure did, and I— Q. Wait just a minute—what was the tone of her voice—was it angry or in kindness? She was very angry, and nervous with it. Q. What was next said, if you recall—anything said about a knife? A. I said, 'What are you going to do—are you going to stab me with that knife?' I seen she was opening it or something—I was excited so bad—I throwed by sandwich down, run my hand in my pocket and opened my knife. I struck her once to keep her off of me, but didn't strike to kill her. Q. What did you think about that knife? A. I was afraid of it. Q. Did you believe L. C. Funderburk would cut your life out of you with that knife? Mr. Haile: I want to object to that question, and putting the answer in the witness' mouth—and being a leading question. The Court: Overruled—overruled, that's not leading. A. Yes, sir. Q Did you believe she meant to kill you? A. She did. I was really afraid she meant to hurt me."

For a reversal of the case, it is first contended that the court erred in permitting the witness W. E. Kelley to testify in behalf of the state.

This contention is based upon the fact that the name of the witness was not endorsed upon the information prior to the trial. It is revealed that this witness was the justice of the peace before whom the preliminary examination of defendant was had. He was placed upon the witness stand by the state for the purpose of identifying the transcript which he had filed in the court clerk's office, preliminary to the offering of the testimony of an absent witness. He gave no material testimony in the case. Under these facts, we find that it was not error to permit the name of this witness to be endorsed on the information at the time of the trial, and to permit him to testify as above indicated. 22 O. S. 1941 § 303, and cases cited; Leigh v. State, 34 Okla. Cr. 338, 246 P. 667; Jeffries v. State, 13 Okla. Cr. 146, 162 P. 1137. It is also contended that this witness had a son upon the jury, and for this reason it was error to permit him to testify. This was a matter within the discretion of the trial court, and in the absence of any proof that defendant was prejudiced by the testimony of this witness, we find it was not reversible error.

It is next contended that the court erred in excluding competent and material testimony offered by the defendant.

This contention is based upon the attempt of the defendant to offer evidence that her husband and L. C. Funderburk had been keeping company, and that upon one occasion they had been arrested when found in a room together, and that deceased had entered a plea of

guilty, and paid a fine in the city court in connection with charges growing out of this offense. The court sustained an objection to this testimony, and the defendant excepted. It is claimed that this evidence was admissible for the purpose of showing that defendant had a motive for taking the life of deceased, and that her plea being self-defense, this testimony was admissible for the consideration of the jury as to who was the aggressor.

We think this evidence was admissible for the reasons above stated, but it has often been held by this court that a case will not always be reversed by reason of the failure to admit evidence, or the admission of evidence that is inadmissible. Such evidence will be considered with reference to the whole record, and it will then be determined whether the refusal to admit, or the admission, of such evidence has denied to a defendant a substantial right.

Here the defendant was charged with the crime of murder. The jury found her guilty of manslaughter in the first degree, and assessed her punishment at four years in the penitentiary, which was the minimum punishment provided by the statute. There can be little doubt but that the jury took into consideration the relation of the parties, which was presented to the jury by other evidence. The testimony of the defendant which went to the jury clearly revealed the reason for her action at the time of the difficulty, and this testimony showed the relationship between the deceased and the husband of defendant. The court permitted the defendant to testify that other parties had called her and told her of threats made against her by the deceased.

The refusal of the court to admit the evidence complained of would come clearly within the harmless error

doctrine that has so often been applied in this state. 22 O.S. 1941 § 1068; Jackson v. State, 77 Okla. Cr. 160, 140 P. 2d 606; Rickman v. State, 70 Okla. Cr. 355, 106 P. 2d 280; Johnson v. State, 70 Okla. Cr. 270, 106 P. 2d 149; Cotter v. State, 74 Okla. Cr. 304, 125 P. 2d 777; Reynolds v. Reynolds, 192 Okla. 564, 137 P. 2d 914.

Witnesses for the defendant also testified that the knife introduced in evidence and identified by defendant was found in the street about 50 or 100 feet from the scene of the difficulty, and that it had blood on it. There was no evidence that defendant had been cut or stabbed.

From the statement of the case, it can be readily seen that there was some conflict as to just what happened at the time of the killing; but we are of the opinion that the evidence is sufficient to sustain the judgment and sentence. A judgment based upon the verdict of the jury will not be set aside merely because there is a conflict in the evidence. It is only when the evidence is insufficient to sustain the judgment and sentence that it will be set aside.

It is next contended that the final argument of the county attorney, and the argument of the assistant county attorney were prejudicial to the rights of the defendant.

The argument of the county attorney was not taken by the court reporter. The statements made by counsel for defendant are such that it is impossible to know the reason for the making of same. One of the statements was, "We are willing to show all of the facts." The statement of the assistant county attorney is not shown by the record, but counsel stated, "I am going to object to the remarks of the assistant county attorney, and he has just stated to the jury that because of her jealousy she planned to take the life of this woman." Objection

352

was also made to the reference by the county attorney to the defendant as "a sleek black tigress." The court sustained an objection to the last statement.

It has often been held by this court that when considering the argument of the county attorney, the whole record will be examined, and unless it is found that the argument, in view of the entire record, is such as to affect the substantial rights of the defendant, or to cause bias and prejudice in the minds of the jury, the case will not be reversed by reason thereof. Defendant in this case was only given the minimum sentence for manslaughter in the first degree. Certainly the jury did not act with prejudice toward defendant. The facts in the instant case do not bring it within the rule announced in the cases cited by defendant.

For the reasons herein stated, the judgment and sentence of the district court of Pittsburg county is affirmed.

JONES, P. J., concurs. DOYLE, J., not participating.